[No. B218758. Second Dist., Div. Eight. Apr. 13, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
GABRIEL ARCEO et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of the last sentence of the second paragraph of the Summary, the succeeding two paragraphs of the Summary, the introductory paragraph of part 1 of the Discussion, and parts 1.b., c., and 2 of the Discussion.

COUNSEL

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Gabriel Arceo.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Ernesto Mejorado.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven E. Mercer, Joseph P. Lee and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GRIMES, J.—**

## SUMMARY

A jury convicted Ernesto Mejorado of three murders and a second jury convicted Gabriel Arceo of two of the murders. Both defendants were also convicted by their respective juries of conspiracy to murder two of the victims. Firearm and gang enhancements, as well as special circumstances allegations of murder while engaged in robbery (in Mejorado's case), multiple murders and murder of a witness, were found true. The juries could not agree on the death penalty in either case, and defendants were sentenced to consecutive terms of life imprisonment without parole, as well as additional terms of imprisonment for the enhancements.

On appeal, Arceo asserts that the admission of testimony from witnesses who recounted inculpatory statements by Mejorado and another codefendant, who was tried separately, violated his Sixth Amendment right to confront adverse witnesses. In the published portion of this opinion, we conclude there was no Sixth Amendment violation.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 556.

## FACTS

### 1. *Overview of the Murders and the Participants*

Defendants Arceo and Mejorado were members of a gang, the Krazy Ass Mexicans, as was Francisco Ramirez. Sergio Mejorado, defendant Mejorado's half brother, was a member of a different gang. These four gang members were participants in some or all of the three murders in this case. (Sergio Mejorado was not a defendant in this case, and Ramirez, who was a defendant, is not a party to these appeals.)

Mejorado and Ramirez, who were good friends, lived in a converted garage adjacent to a house (the Lopez house) owned by Mejorado's grandmother, Maria Lopez. Maria Lopez lived there with her sons Adan and Ramon Lopez, and Ramon's son David Lopez. Another grandson, Tommy Lopez, also a gang member, lived elsewhere with his then girlfriend, Jessika Merrill. Defendant Arceo and codefendant's half brother, Sergio, also lived elsewhere. Arceo had two children with Maribel Mejorado, defendant Mejorado's cousin. Except for Tommy, none of the other Lopezes were gang members. (To avoid confusion, we refer to all of the Lopezes as well as to Sergio Mejorado by their first names.) Jennifer Sanchez and America (or Erica) San Miguel, two young women described as "druggies," spent a lot of time at the garage of the Lopez house with Mejorado and Ramirez.

The first murder victim was Raymundo Flores. Flores drove a green Impala with special chrome rims and electronic equipment, and there was evidence suggesting he had recently come into possession of $18,000 and that this was known to Ramirez and Mejorado. In the early morning hours of April 12, 2005, Flores was shot in the back of the head with a .380-caliber round from a semiautomatic handgun. He was found in an alley near the Lopez house and later died. That same morning, Mejorado knocked on the door of the Lopez house and, in an excited state, told his cousin, David, who had been sleeping in the living room, that "they [(he and Ramirez)] had murdered some guy" in the alley. David went back to sleep. A few hours later, when he got up to go to work, David saw a green car with expensive rims in the driveway, covered with blankets.

The next day, Ramirez and Mejorado took the rims off the car, replaced the tires with spare tires, and took televisions and other electronic equipment from the car and put them in the house. Sanchez, one of the "druggies," was present, as were Tommy and his girlfriend Merrill.

Ramirez drove away in the stripped car with Sanchez, taking the car a couple of streets away from the Lopez house. Mejorado followed with

Tommy and Merrill. When Tommy and Merrill drove up, the others "had gas on the car," and Mejorado then set it on fire.

The next two victims were Sanchez and San Miguel, the two young women who were frequently at the garage of the Lopez house with Mejorado and Ramirez. Twelve days after the Flores murder, the two young women were in the garage with Mejorado, Arceo, Ramirez, Sergio, David, and Robert Borjas (a codefendant who was tried jointly with Mejorado and Ramirez but was not convicted). In the course of the evening, after a conclave in the bathroom among Arceo, Sergio, Ramirez and Borjas, Borjas said, "We're going to tie these bitches up," which David understood to mean that Sanchez and San Miguel knew too much and had to be "gotten rid of."

David left the garage after some comments by Sergio that David under-stood as an indirect threat to David, and went to the Lopez house to go to bed. Thereafter, Sergio and Arceo killed Sanchez and San Miguel. In the morning, Mejorado woke up David and asked to borrow his car. David gave Mejorado the keys and went back to sleep. When he woke up again and went outside, Mejorado, Arceo, Sergio and Borjas were there. Borjas told David not to go into the garage because "they had just killed Jennifer and Erica." Arceo told David that Sergio had grabbed San Miguel, shoved her into the bathroom, and shot her a couple of times, and that he (Arceo) then took the gun from Sergio, grabbed Sanchez by her hair, and "put a bullet in the back of her head." Sergio bragged about the shooting as well.

Mejorado and Ramirez loaded the bodies (which had been dragged from the garage to the living room of the Lopez house) into the trunk of David's car; Sergio and Arceo were gone by this time. Ramirez left in the car with the bodies, which were found the next day in Tulare County, burned and unrecognizable. Adan, David, Tommy and Merrill cleaned up the house, and Adan painted the garage. Ramirez brought David's car back, and David, Tommy and Merrill cleaned it.

2. *The Aftermath of the Murders*

After the murders of San Miguel and Sanchez, Mejorado and Ramirez did not return to the Lopez house again, and Adan moved into the garage.

The three killings may have remained unsolved were it not for Merrill, Tommy's girlfriend (who died before the trial). Several days after the murders of Sanchez and San Miguel, Merrill made a then anonymous call to the Tulare County police, reporting the three murders. This resulted in a warrant to search the Lopez house, multiple interviews of David and Adan as well as interviews of Merrill, a search of a house in Delano belonging to

Mejorado's mother, and a search of David's car. The bodies of San Miguel and Sanchez were eventually identified through fingerprints on one of the bodies and teeth from the other body.

Arceo was arrested on May 31, 2005, after a routine traffic stop, at which he gave a different name. Mejorado was arrested in August 2006 in Delano; he also used a different name and was later discovered to have outstanding warrants for the three murders.

### 3. *The Charges*

An information was filed in November 2005 charging Arceo and Sergio with the murders of San Miguel and Sanchez. In April 2007, a first amended information charged Ramirez, Mejorado, and Borjas, as well as Arceo and Sergio, with the San Miguel and Sanchez murders (counts 1 and 2 respectively); charged Mejorado and Ramirez with Flores's murder (count 3); and contained various firearm, gang and special circumstances allegations.[1] The third amended information added charges that the five defendants conspired to commit the murders of San Miguel and Sanchez (counts 5 and 6 respectively). In the final, fifth amended information, Arceo and Mejorado were charged as follows:

Arceo was charged with the San Miguel and Sanchez murders and with conspiracy to commit those murders. (§§ 187, subd. (a), 182, subd. (a)(1).) The information alleged firearm use by a principal as to the two murders (§ 12022.53, subds. (d) & (e)(1), (c) & (e)(1), (b) & (e)), and included three personal-firearm-use allegations in connection with San Miguel's murder (*id.*, subds. (b), (c) & (d)), allegations that the murders were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)), and allegations of special circumstances: that San Miguel and Sanchez were killed because they were witnesses to a crime (§ 190.2, subd. (a)(10)), and multiple murders (*id.*, subd. (a)(3)).

Mejorado was charged with all three murders and with conspiracy to murder San Miguel and Sanchez. In addition, there were the same allegations of firearm use by a principal in connection with the three murders, allegations that all the offenses were committed for the benefit of a criminal street gang, and allegations of special circumstances: witness killing, multiple murders, and that Flores was murdered during the commission of a robbery (§ 190.2, subd. (a)(17)).

---

[1] The first amended information also charged Tommy in count 4 with concealing and aiding the others to avoid arrest and punishment for the murders (Pen. Code, § 32). The charges against Tommy were disposed of separately; the charges against Sergio Mejorado were also severed from this case.

All statutory references are to the Penal Code unless otherwise specified.

### 4. *The Trial*

The case was tried before two juries, one for Arceo and the other for Mejorado, Ramirez and Borjas. The trial extended over several months and more than 60 witnesses testified in the guilt phase. In the end, the only testimony at issue in these appeals (with minor exceptions), and the testimony critical to the murder convictions, is the testimony of David, Adan, and (in Arceo's case) Merrill.

At the risk of some repetition, we summarize the testimony from these witnesses that supports the convictions. Other evidence will be discussed as necessary in connection with our analyses of the specific issues raised by Arceo and Mejorado.

#### a. *Jessika Merrill*

Jessika Merrill testified at Arceo's preliminary hearing, and her testimony was read to Arceo's jury.

Merrill was Tommy's girlfriend. She saw and participated in stripping the green Impala of its rims, tires and electronic devices, together with Tommy, Ramirez, Mejorado, David and Adan. The group, with Merrill and Tommy driving separately, then drove the car a couple of streets away from the Lopez house. When Merrill and Tommy drove up, the others "had gas on the car." Mejorado set it on fire, and "[i]t blew up." Mejorado got burned.

A few days later, Merrill saw Sanchez, whom she described as "a druggy that hung around at" the Lopez house, burn "the clothes [Ramirez] was wearing I guess the night of that murder." This occurred while the group (Ramirez, Mejorado, Tommy, David and Adan) were having a cookout. Merrill saw "red . . . liquidy substance or dried red stains" on the clothing and on the shoes. Merrill, on several occasions after Flores's murder, heard various members of the group (Ramirez, Mejorado, Adan, David and Borjas) talk about an intention "[t]o dome her [(Sanchez)] because she knew too much." ("[D]ome the bitch" means "blow her head off.") "I heard them saying—they said it right there in the open that they knew too much and they thought she was going to go and tell the cops." (Tommy said "don't do this, don't think about this, this is stupid.")[2]

---

[2] Merrill also testified: "Whenever they are talking about doming her [(Sanchez)] and then Tommy Lopez, Adan Lopez and I think it was David told them that, no, that that was stupid, that there is no point in it, that she's not going to say anything, what's the point of killing her. There is no point." And "[a]ll the Lopez people" were saying "that is stupid, that there is no point in it."

Merrill testified that, after the Flores murder, Ramirez "had [Sanchez] basically in check." Sanchez "couldn't go anywhere. She couldn't do anything. She wasn't allowed to leave after the first murder." Merrill said that Sanchez tried to use the phone but was told by Mejorado that she could not use the phone. After the Flores murder, Ramirez and Mejorado left, taking "the stuff from the Impala," and went to Delano, taking Sanchez with them. They returned, then left again after burning the Impala. Merrill told Sanchez that "they were going to dome her" and that she should leave and not come back. On one occasion, Merrill took Sanchez to the store and told her not to come back, but she did anyway.

Merrill and Tommy drove to the Lopez house on the day Sanchez and San Miguel were murdered and saw Ramirez and Mejorado. While they were there with Ramirez, Merrill heard gunshots; Mejorado was sitting outside in a little chair at the time. Ramirez looked at Tommy and said, "Get out of here," and Merrill and Tommy left. They went to their home, and a couple of hours later, Mejorado called and told Tommy "that they needed help." Merrill did not want Tommy to go, but "he had to go," because "[t]hat was his family." Merrill testified that, "I figured if I wouldn't have acted the way I did, I was cool with everything [(the murders of Sanchez, San Miguel and Flores)], I might have been the third one there."

Merrill and Tommy returned to find David's car backed up to the front door, and Mejorado, Ramirez, Adan, David and Borjas were all there, standing behind the opened trunk.. (Merrill did not recall seeing Sergio and Arceo.) She approached and saw a big bag and smelled "a nasty stench." She went to sit in her truck, and saw Tommy and Adan holding up a blanket; she saw Mejorado and Ramirez moving something from the front entrance of the house into the trunk of the car. Ramirez then left in the car with the bodies in the trunk. Before Ramirez left with the bodies, he told Merrill, "See how easy this shit is," a comment which Merrill took as a threat.

Merrill and Tommy cleaned up some of the blood that was in the front (outside the house) and then went home. At some later point, David drove his car to Tommy and Merrill's house, and they helped him clean the car.

Merrill agreed that her memory was better when she was interviewed by the police two months after the murder. This exchange then occurred with the prosecutor:

"Q. Do you remember saying that [Sergio and Arceo], you seen them—

"A. In and out.

"Q. —at the house on the day of the murders of the two girls? [¶] So ma'am, you can answer the question. Do you remember, did you tell the

police that you remember seeing [Sergio and Arceo] there very early on the day of the murders of the two girls?

"A. I recall seeing them. Like I said in and out those days, the day before and that day. I don't remember seeing them like talking to them. I didn't say anything to them, but I remember seeing them in and out. That's it."

Merrill's testimony was read only to Arceo's jury, but both juries heard various parts of Merrill's statements that were declarations against interest. Thus Detective Martinez, who interviewed Merrill, testified that Merrill told him that she helped to clean up the blood from the Lopez home, and "we helped them clean the trunk" of David's car, and talked about "how we blew up the car" (referring to Flores's car). After Sanchez and San Miguel were murdered, Merrill eventually called the police and told them what happened.

### b. *David*

David was asleep in the living room of the Lopez house on the night of the Flores murder, when Mejorado knocked on the door. David opened the door and Mejorado and Ramirez were there. They were "kind of panicking," "[k]ind of like a freak mode, like they were in a rush to do things." Mejorado told him "they had murdered some guy." David told the police that Mejorado asked David if he had heard a gunshot, and said, "Man, we murdered somebody, we murdered somebody, hurry up," and "[w]e just murdered somebody." Mejorado grabbed some clothing and ran back out. David responded, when asked if he told police that only Mejorado came into the house and he (David) did not actually see Ramirez, "That could be right." When Mejorado said, "We just killed someone," David's impression was that Mejorado was talking about him (Mejorado) and Ramirez. David asked Mejorado, " 'Where,' and he said, 'In the alley.' "

David went back to sleep, and when he woke at 5:30 the next morning, he saw Flores's car with blankets on it in the driveway. A day or so later, he saw Mejorado and Ramirez stripping the car. They took the tires off the car and put some spare tires on it, and took stereo equipment, compact discs, and televisions out of the car. Sanchez was with them, sitting inside the car. Ramirez got some gas that he put in a milk container. Ramirez drove away in the car with Sanchez, and Tommy and Merrill drove away with Mejorado. David later saw Mejorado with burns on the side of his face. Mejorado told him he got burned because he tried to set the car on fire. (David did not tell the police about Mejorado's statement the first time he was interviewed, during which he "lied to the police and totally protected [Mejorado] and told [police] [he] didn't know anything"; David lied because "[h]e's family . . . .")

When Mejorado told David that they had just killed somebody, he did not identify the victim. David found out later that it was Flores, "[w]hen

[Ramirez] bragged about it." (David told police that it was Mejorado who told him they had killed Flores.) David testified that a couple of days before the Flores murder, a girl he did not know told Mejorado (and perhaps Ramirez) that Flores had $18,000 because of a "tax return or something like that."

After the Flores murder, David observed that Sanchez "couldn't go no-where without—without them [(Ramirez and Mejorado)] being with her or without their authorization." "She would go to the alley, you know, they had to be aware of it. She couldn't just go off anywhere by herself." On one occasion, Sanchez tried to go to the alley, "and I think [Mejorado] ran after her and then asked her where she was going." It appeared to David that "they weren't letting her leave."

Twelve days after the Flores murder, Sanchez and San Miguel were in the garage socializing and drinking beer with David, Mejorado, Arceo, Ramirez, Sergio, and Borjas. In the course of the evening, Arceo, Sergio, Ramirez and Borjas were talking in a group, and Arceo had a .380-caliber or nine-millimeter handgun. The four of them rushed into the bathroom and David followed them because he wanted to know what was going on. (Mejorado did not follow the group into the bathroom; he had recently been shot in the leg and it was difficult for him to get around.) Ramirez and Sergio then walked out of the bathroom, and Borjas said, "We're going to tie these bitches up," which David understood to mean that Sanchez and San Miguel "knew too much so they had to get rid of them." David's impression was that Sergio and Ramirez "didn't want me to hear anything. Every time I got close to them, they kind of like backed away from me." Sergio said something like "I have home girls that are down to kill," or "down for murder." David took Sergio's comment as meaning "that the girls are down to kill people" and as an indirect threat to David, so David left the garage and went to bed.

In the morning, Mejorado woke David up and asked to borrow David's car; Sergio was sitting on the couch and was sweating. David gave Mejorado the keys and went back to sleep. When he woke up again and went outside, Mejorado, Arceo, Sergio and Borjas were there. Borjas told David not to go into the garage because "they had just killed Jennifer and Erica." Arceo bragged about the murders, telling David that Sergio had grabbed San Miguel, shoved her into the bathroom, and shot her a couple of times, and that he (Arceo) then took the gun from Sergio, grabbed Sanchez by her hair, and shot her. Sergio bragged about his part in the murders as well.

David said that Adan came outside the house and asked David if he had seen what was inside, referring to the bodies. David then went inside and saw the bodies for the first time. Mejorado, Sergio and Ramirez loaded the bodies

into the trunk of David's car. David and Adan held up blankets while the bodies were being loaded in the car, so that no one in the neighboring church parking lot could observe what was being done.

After the bodies were loaded up, Ramirez drove the car away. David never saw Ramirez return to the Lopez house after that time, nor did he ever see Mejorado again. David helped clean up the house, "meaning mop up blood and stuff like that." David painted and cleaned up "the blood and stuff in the shower." Tommy and Merrill were present when the house was being cleaned up.

David later called Mejorado to tell him he (David) wanted his car back. Mejorado was angry at David for demanding the return of his car and David felt threatened. Ramirez eventually brought the car back to the driveway of the Lopez house. One of the sides of the car was "trashed." David took the car to Tommy's house and David, Tommy and Merrill cleaned the trunk of his car. Ramirez told David to burn the car, but David refused; Ramirez then told him to change the tires, and David did so.

David said that after the murders, Ramirez and Mejorado fled to Guadalajara (and tried to get David to go with them); David moved to Delano to live with his brother.

David was interviewed by the police several different times in May 2005, and twice more in May and July 2006. During his first interview, he lied to the police to protect Mejorado and told them he did not know anything. In subsequent interviews, he told "part of the truth . . . and some I held back." Sometime after the May 2005 interviews, David moved to Oregon. He was arrested in Oregon by federal agents in March 2006, and told them that his cousin (or cousins) "shot [a] couple of girls for no reason" and all he did was to clean up blood.

David was charged with aiding and abetting after the fact (§ 32); he pled guilty and was put on probation (after serving a little time in county jail). David first told the police that Arceo and Sergio had bragged to him about shooting the girls in his fifth interview, in July 2006, after he had served his time on the accessory charge and had been relocated back to Oregon.

### c.  *Adan*

Adan is the uncle of Mejorado, David and Tommy, and lived in the Lopez house. Mejorado was his favorite nephew. Like David, he was arrested and pled guilty to charges of aiding in the murders after the fact (§ 32). He was in custody when he testified at trial because he had called Detective Martinez

and told him he would not testify unless Mejorado was released. He said that he feared for his life because he was testifying, and when he talked to the police in May 2005, he was concerned that he might be killed by friends or "homeboys" of Arceo's or Sergio's. Adan told police he lied to them in his first interview because, when Ramirez, Arceo and Sergio's homeboys—their fellow gang members—"find out that I'm telling you that I told you everything, they're going to be—they're going to be on me and they're going to try to kill me. That's why I lied the first time."

Adan was also asleep in the living room of the Lopez house on the night of the Flores murder, when he was awakened by Mejorado's knocking on the door. Mejorado looked scared. Adan walked out on the porch, heard a car engine and saw a green car; Ramirez was in the car. Adan then went back to sleep. The next morning, he saw the green Impala covered with blankets.

Adan also saw Mejorado and Ramirez taking the rims off the car. Ramirez told Adan that he shot Flores in the back of his head. After they took the rims off the car and put them in the garage, Ramirez drove away in the car with Sanchez. Mejorado left with Tommy and Merrill. The next day, Adan saw Mejorado with burns on his face.

When Adan woke up on the morning after Sanchez and San Miguel were killed, he saw Sergio sitting on the couch. He went back to sleep and when he woke up again, he saw San Miguel's body wrapped in a blanket behind the couch. He "got freaked out" and went outside, where he saw Sergio and Ramirez. He eventually saw Mejorado walk out of the garage.

Sergio told Adan that he had gone in the bathroom and shot Sanchez while she was standing in the shower. Sergio said he was going to shoot San Miguel, but Arceo told Sergio that he would take care of San Miguel; Sergio handed the gun to Arceo and Arceo shot San Miguel in the head. At trial, Adan said he never spoke to Arceo, but Adan told the police that Arceo told him (Adan) the same story that Sergio told him, including that Arceo told Sergio to give him (Arceo) the gun, Sergio did so, " 'and that's when he [(Arceo)] got [San Miguel] and took her to the restroom.' "[3]

Adan saw that Sanchez's body was put in his (Adan's) duffle bag. Adan testified he saw Ramirez and Borjas loading the bodies into a car, but when he was first interviewed by Detective Martinez, he told Martinez "it was [Ramirez] and [Mejorado] loading the bodies," and Sergio and Arceo were gone by this time.

---

[3] David's and Adan's accounts conflicted in that David testified that Arceo said that Sergio killed San Miguel and he (Arceo) killed Sanchez, while Adan testified that Sergio and Arceo told him that Sergio killed Sanchez and Arceo killed San Miguel.

After he found out how Sanchez and San Miguel were killed and after the bodies were moved, Adan helped Mejorado clean up the house. He washed down the blood in the driveway and mopped up the blood in the living room. Tommy and Merrill arrived during the cleanup of the house.

Adan told the police that Mejorado told him that Arceo and Sergio killed Sanchez and San Miguel. Adan told police that Ramirez told him that they killed the girls because they were afraid Sanchez was going to snitch on them (about the Flores murder). Ramirez drove away with the bodies and Borjas burned clothing in the alley.

### 5. The Verdicts and Sentences

#### a. Arceo

Arceo's jury convicted him of the first degree murders of Sanchez and San Miguel and of the two conspiracy counts, and found all the enhancing allegations and special circumstances true. The jury declared itself dead-locked on the death penalty, and the prosecution decided not to retry the penalty phase. The court sentenced Arceo to life in prison without the possibility of parole for each of the two murders. As to count 1 (San Miguel), the court imposed a consecutive sentence of 25 years to life under section 12022.53, subdivision (d) (personally and intentionally discharging a firearm proximately causing death) and stayed the findings on the other firearm enhancements (§ 12022.53, subds. (b), (c) & (e)(1)). As to count 2 (Sanchez), the court also imposed a consecutive term of 25 years to life under section 12022.53, subdivisions (d) and (e)(1) (for a principal's personal and inten-tional discharge of a firearm causing death with a § 186.22 gang allegation found to be true). The court imposed and stayed sentences of life imprison-ment without parole on the conspiracy counts (§ 654), and made various other orders on restitution, presentence custody credits and so on.

#### b. Mejorado

Mejorado's jury found him guilty of the first degree murder of Flores. The jury found true the allegations that a principal personally and intentionally discharged a firearm proximately causing the death of Flores (as well as the lesser firearm allegations), and found the special circumstance allegation (that Mejorado committed the murder while engaged in a robbery) to be true.

The jury also found Mejorado guilty of the first degree murders of San Miguel and Sanchez, and found true the allegations that a principal personally and intentionally discharged a firearm proximately causing the deaths of San Miguel and Sanchez (as well as the lesser firearm allegations and the gang

allegation). The jury found the special circumstance allegations that San Miguel was intentionally killed because she was a witness to a crime, and that Mejorado committed more than one offense of murder, to be true. The jury also found Mejorado guilty of conspiracy to commit the murders of San Miguel and Sanchez, and found the gang allegations attached to those counts to be true.

The jury could not reach verdicts on the special allegation that Sanchez was killed because she was a witness to a crime or on the gang allegation attached to the Flores murder count, and the court declared a mistrial on those allegations.[4]

As in Arceo's case, Mejorado's jury declared itself deadlocked on the death penalty. The court sentenced Mejorado to three terms of life without parole, plus 50 years to life for the firearm enhancements with respect to the San Miguel and Sanchez murders. The court imposed and stayed sentences on the conspiracy counts under section 654, and made various other orders on restitution, presentence custody credits and the like.

Arceo and Mejorado filed timely appeals.

## DISCUSSION

1.  *Arceo*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

a.  *The admission of testimony from David and Adan did not violate Arceo's Sixth Amendment right to confront adverse witnesses.*

Before and throughout the trial, Arceo sought to exclude and objected to the admission of testimony from David and Adan recounting the inculpatory statements that Sergio and Mejorado made to them. Likewise on appeal, Arceo challenges the introduction of those statements as a denial of his Sixth Amendment confrontation rights. Specifically, Arceo complains of three sets of statements: (1) David's testimony that Sergio confirmed Arceo's own account of the murders; (2) Adan's testimony that Sergio bragged to him

---

[4] As to Borjas, the jury could not reach any verdicts and the court declared a mistrial. Ramirez was convicted of the murders of San Miguel and Sanchez (and the jury made true findings on the related firearm and gang allegations, as well as on the special circumstance allegations of witness killing in the San Miguel murder and multiple murders), but the jury could not reach a verdict on the Flores murder (or the witness killing allegation as to Sanchez), and the trial court declared a mistrial as to that count and allegation.

[*] See footnote, *ante*, page 556.

about the murders; and (3) Adan's prior statement to the police (elicited by counsel for Borjas) that Mejorado told him that Sergio and Arceo perpetrated the murders.

The substance of Arceo's claim is that the testimony in question consisted of hearsay statements of nontestifying codefendants, and that such statements are inadmissible under *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*). Further, the argument continues, various exceptions to the *Bruton/Aranda* rule—declarations against interest, hearsay statements containing particularized guarantees of trustworthiness, and coconspirator statements in furtherance of a conspiracy—do not apply. Ergo, use of incriminating statements by nontestifying codefendants (Sergio and Mejorado) who cannot be cross-examined violates the confrontation clause of the Sixth Amendment.

Our review of the applicable precedents leads us to conclude otherwise.

### (1) *The applicable law*

■ First, the confrontation clause has no application to out-of-court nontestimonial statements (*Whorton v. Bockting* (2007) 549 U.S. 406, 420 [167 L.Ed.2d 1, 127 S.Ct. 1173] (*Whorton*); *People v. Gutierrez* (2009) 45 Cal.4th 789, 812 [89 Cal.Rptr.3d 225, 200 P.3d 847]), including statements by codefendants. (*U.S. v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85 (*Figueroa-Cartagena*) [*Bruton* must be viewed "through the lens of *Crawford* and *Davis*";[5] if the challenged statement is not testimonial, the confrontation clause has no application]; see also *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326 ["[b]ecause it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to non-testimonial statements"].)

■ Second, even if the *Bruton* rule applied to nontestimonial statements of nontestifying codefendants, *Bruton* itself involved hearsay statements of codefendants that were "clearly inadmissible" under the rules of evidence. As Arceo necessarily concedes, under *Bruton* and its progeny, a codefendant's hearsay statement *is* admissible "if it falls within a 'firmly rooted' hearsay exception or is 'supported by a showing of particularized guarantees of trustworthiness.' [Citation.]" (*U.S. v. Mussare* (3d Cir. 2005) 405 F.3d 161, 168.)

■ Third, California courts before and after *Crawford* have held that the admission of statements possessing sufficient indicia of reliability to fall

---

[5] *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*); *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*).

within the hearsay exception for declarations against interest does not deny a defendant the right of confrontation guaranteed by the United States Constitution. (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 176–177 [12 Cal.Rptr.3d 774] (*Cervantes*); *People v. Greenberger* (1997) 58 Cal.App.4th 298, 330–331 [68 Cal.Rptr.2d 61] (*Greenberger*).)

We reprise the pertinent cases in more detail.

In *Bruton*, the high court held that the introduction of a codefendant's confession implicating the defendant in a joint trial violated the right of cross-examination secured by the confrontation clause of the Sixth Amendment, even if the jury is instructed to consider the confession only against the codefendant. (*Bruton, supra,* 391 U.S. at p. 137; see also *People v. Fletcher* (1996) 13 Cal.4th 451, 455 [53 Cal.Rptr.2d 572, 917 P.2d 187] [*Bruton* "extends only to confessions that are not only 'powerfully incriminating' but also 'facially incriminating' of the nondeclarant defendant"].)[6] *Bruton* emphasized that the hearsay statement inculpating the defendant "was clearly inadmissible against him under traditional rules of evidence . . . ."[7] (*Bruton, supra,* at p. 128, fn. 3.) The court continued: "There is not before us, therefore, any recognized exception to the hearsay rule insofar as [defendant Bruton] is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." (*Ibid.*) In *Aranda, supra,* 63 Cal.2d 518, which preceded *Bruton,* the California Supreme Court adopted an approach similar to the *Bruton* rule as "judicially declared rules of practice." (*Aranda,* at pp. 530–531.) (*Aranda* was abrogated in 1982—"[t]o the extent that [*Aranda*] constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law"—by the "truth-in-evidence" provision of Prop. 8 (Cal. Const., art. I, § 28, subd. (d)).) (*People v. Fletcher, supra,* at p. 465.)

■ In *Crawford, supra,* 541 U.S. 36, the high court held that the confrontation clause barred the admission of testimonial statements of a

---

[6] Courts have held that *Bruton* "applies not only to custodial confessions, but also when the statements of the non-testifying codefendant were made to family or friends, *and are otherwise inadmissible hearsay.* [Citations.] A hearsay statement is admissible under *Bruton* and its progeny, however, if it falls within a 'firmly rooted' hearsay exception or is 'supported by a showing of particularized guarantees of trustworthiness.' [Citation.]" (*U.S. v. Mussare, supra,* 405 F.3d at p. 168, italics added.)

[7] In *Bruton*, a postal inspector testified that, in the course of two interrogations in a city jail (while the codefendant was in custody on state criminal charges), the codefendant orally confessed to him that he and the defendant committed an armed robbery. (*Bruton, supra,* 391 U.S. at p. 124.)

witness who did not appear at trial, unless he was unavailable to testify and the defendant had had a previous opportunity for cross-examination.[8]

In *Davis, supra,* 547 U.S. at page 821, the high court explained that "[o]nly statements of this sort [(testimonial statements)] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 291 [85 Cal.Rptr.3d 393] ["after *Davis,* the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial"; if the statement is not testimonial, "it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule"].)

In *Greenberger, supra,* 58 Cal.App.4th at pages 330–331, a case predating *Crawford* and *Davis,* the court held that the "admission of a statement [of a codefendant] possessing sufficient indicia of reliability to fall within the hearsay exception of a declaration against penal interest does not deny a defendant the right of confrontation guaranteed by the United States Constitution."[9]

In *Cervantes, supra,* 118 Cal.App.4th 162, the court, relying on *Crawford* and *Greenberger,* explained that *Crawford* recognized that if the statement at issue is nontestimonial, the rules of evidence, including hearsay rules, apply; state courts may consider " 'reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. [Citation.]' [Citation.]" (*Cervantes,* at p. 173.) Thus *Cervantes* held that the

---

[8] Before *Crawford,* the rule enunciated by the United States Supreme Court in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] governed: the hearsay statement of a declarant not present for cross-examination at trial was admissible under the confrontation clause only if the declarant was truly unavailable and the statement bore adequate indicia of reliability. *Roberts* is no longer the law. "[The United States Supreme Court] has made clear that *Roberts* . . . and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause. . . . Thus, there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution." (*People v. Cage* (2007) 40 Cal.4th 965, 981–982, fn. 10 [56 Cal.Rptr.3d 789, 155 P.3d 205], citation omitted.)

[9] *Greenberger* observed: "In order for a statement to qualify as a declaration against penal interest the statement must be genuinely and specifically inculpatory of the declarant; this provides the 'particularized guarantee of trustworthiness' or 'indicia of reliability' that permits its admission in evidence without the constitutional requirement of cross-examination. Therefore, the determination that the statement falls within this hearsay exception also satisfies the requirements of the confrontation clause." (*Greenberger, supra,* 58 Cal.App.4th at p. 329.)

trial court properly admitted a codefendant's nontestimonial statement as against the other defendants, because the statement qualified as a declaration against interest and satisfied the constitutional standard of trustworthiness. (*Id.* at p. 177.)

### (2) *This case*

Arceo concedes that the statements by Sergio and Mejorado to David and Adan were not testimonial. But he resists the conclusion that, because the statements were not testimonial, there was no confrontation clause violation. Instead, he asserts that the *Bruton* line of cases represents a "special rule" that applies to extrajudicial statements of unavailable codefendants who make incriminating statements, "a rule that survives the 'testimonial vs. nontestimonial' classification." Arceo points to *People v. Garcia*, where the court observed that, "Whether the *Aranda/Bruton* rule applies only to extrajudicial *testimonial* statements appears to be an unsettled question, and one that we need not address in this case."[10] (*People v. Garcia, supra*, 168 Cal.App.4th at p. 282, fn. 12.)

But, as we have seen, since *People v. Garcia*'s observation, a number of federal courts have expressly held that the *Bruton* rule does not apply to nontestimonial statements. (E.g., *Figueroa-Cartagena, supra*, 612 F.3d at p. 85; *U.S. v. Johnson, supra*, 581 F.3d at p. 326.) In *Figueroa-Cartagena*, where the extrajudicial statements at issue were nontestimonial, the court first pointed out that *Davis* stated that nontestimonial statements "do not 'cause the declarant to be a "witness" ' within the meaning of the Sixth Amendment and thus are 'not subject to the Confrontation Clause.' [Citation.]" (*Figueroa-Cartagena*, at p. 84.) The court then discussed the earlier *Bruton/Richardson*[11] framework for determining admissibility when a nontestifying defendant's statement is proffered at trial. (*Figueroa-Cartagena*, at p. 85.) The court reasoned that the *Bruton/Richardson* framework "presupposes that the aggrieved co-defendant has a Sixth Amendment right to confront the declarant in the first place." (*Figueroa-Cartagena, supra*, at p. 85.) The court continued: "If none of the co-defendants has a constitutional right to confront the declarant, none can complain that his right has been denied. It is thus necessary to view *Bruton* through the lens of *Crawford* and *Davis*. The threshold question in every case is whether the challenged

---

[10] It was unnecessary to address the point because to the extent there was *Bruton/Aranda* error, it was harmless beyond a reasonable doubt. (*People v. Garcia, supra*, 168 Cal.App.4th at p. 282.)

[11] In *Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702] (*Richardson*), the court held that the confrontation clause "is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."

statement is testimonial. If it is not, the Confrontation Clause 'has no application.' " (*Ibid.*, quoting *Whorton, supra,* 549 U.S. at p. 420.)[12]

Arceo insists that *Figueroa-Cartagena*'s reasoning is flawed. He points out that *Whorton,* on which the *Figueroa-Cartagena* court relied for the proposition that under *Crawford,* the confrontation clause has no application to out-of-court nontestimonial statements (*Whorton, supra,* 549 U.S. at p. 420), did not involve a statement by a nontestifying codefendant, and did not purport to overrule *Bruton.* Of course *Whorton* did not overrule *Bruton,* but there is nothing flawed in *Figueroa-Cartagena*'s reasoning. *Bruton* itself did not purport to govern any recognized exception to the hearsay rule: "[W]e intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." (*Bruton, supra,* 391 U.S. at p. 128, fn. 3.)

■ In sum, from this body of law we can draw only one conclusion. *Crawford, Davis,* and *Whorton* mean what they say—the confrontation clause applies only to testimonial statements—and nothing in the cases applying that principle to extrajudicial statements by nontestifying codefendants is inconsistent with or purports "to overrule *Bruton,*" which itself did not address "any recognized exception to the hearsay rule." (*Bruton, supra,* 391 U.S. at p. 128, fn. 3.) Accordingly, if Sergio's statements to David and Adan, and Mejorado's statement to Adan, were admissible under state law as exceptions to the hearsay rule, there was no error in the admission of that testimony. ■ And, as California courts have held, " 'a declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness.' " (*Cervantes, supra,* 118 Cal.App.4th at p. 177, quoting *Greenberger, supra,* 58 Cal.App.4th at p. 334.)

We turn to the specific testimony at issue.

---

[12] A number of federal cases are in agreement, as shown in *U.S. v. Johnson, supra,* 581 F.3d at pages 325–326 (codefendant's recorded statements were not testimonial and were admissible as statements against the codefendant's penal interest under the Fed. Rules of Evid., 28 U.S.C.): "The Supreme Court's recent clarification of the scope of the Confrontation Clause also eliminates any need to analyze the admissibility of the tape-recording [made by a prison inmate of a conversation with a codefendant] under the rule established in *Bruton* . . . . [Citations.] Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements. *See United States v. Pugh,* 273 [Fed.Appex.] 449, 455 (6th Cir. 2008) ('[T]he statement at issue . . . is nontestimonial in nature, and therefore, does not implicate the Confrontation Clause as analyzed under *Bruton* or otherwise.'); *see also United States v. Vargas,* 570 F.3d 1004, 1009 (8th Cir. 2009) (holding that *Bruton* does not apply to nontestimonial codefendant statements); *United States v. Pike,* 292 [Fed.Appex.] 108, 112 (2d Cir. 2008) ('[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* [] or *Bruton* [].')."

### (a)  *Sergio's statements to David and Adan*

Arceo objects to David's testimony that Sergio confirmed Arceo's account of the murders. Specifically, after describing Arceo's account to him of the murders, which David described as "bragging," David testified that he told the police that Mejorado, Sergio, Borjas and Arceo were all there during the bragging, and that Sergio "brag[ged] about his part too," and that "they both admitted their involvement." Similarly, Arceo objects to Adan's testimony that Sergio bragged to him about the murders. Specifically, Adan testified that Sergio described how he killed Sanchez, and told Adan that, when he was going to shoot San Miguel, Arceo told Sergio that he would take care of her. Sergio told Adan that he handed the gun to Arceo, who tried to grab San Miguel, and when she resisted, Arceo shot her. (Adan also told the police that Arceo told him the same story that Sergio told him.)

To the extent that Sergio's "bragg[ing] about his part" and "admitt[ing] [his] involvement" implicate Arceo (and respondent asserts they do not), the statements are declarations against interest and admissible under Evidence Code section 1230, as are Sergio's statements to Adan describing the murders. Section 1230 provides that: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

Certainly Sergio's bragging to David about his part in the murders meets this statutory definition, as does Sergio's description to Adan of his and Arceo's actions; in each case, the statements subject Sergio to criminal liability. And, as *Greenberger* points out, statements genuinely and specifically inculpating the declarant provide particularized guarantees of trustworthiness.[13] (*Greenberger, supra*, 58 Cal.App.4th at p. 329; see also *Cervantes, supra*, 118 Cal.App.4th at pp. 175–177.)

Arceo insists that *Greenberger* is "wrong," and "bad law," pointing to *Lilly v. Virginia* (1999) 527 U.S. 116 [119 S.Ct. 1887, 144 L.Ed.2d 117] (*Lilly*), where the plurality opinion held that a declaration against penal interest is not a "firmly rooted" exception to the hearsay rule, and does not necessarily render a statement trustworthy so as to be admissible. (*Lilly*, at pp. 126–134; see also *People v. Schmaus* (2003) 109 Cal.App.4th 846, 857 [135 Cal.Rptr.2d 521] [stating *Lilly* plurality opinion casts doubt on *Greenberger*].) But *Lilly*, which involved a 50-page custodial confession, also

---

[13] See also *People v. Spriggs* (1964) 60 Cal.2d 868, 874 [36 Cal.Rptr. 841, 389 P.2d 377] ("a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest").

observed that "[w]hen a court can be confident . . . 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility,' the Sixth Amendment's residual 'trustworthiness' test allows the admission of the declarant's statements." (*Lilly, supra,* at pp. 136, 139 [confession of an accomplice while in custody, primarily responding to leading questions and under the influence of alcohol were not so inherently reliable that cross-examination would have been superfluous].) Indeed, *Greenberger* recognizes that not all statements which incriminate the declarant and implicate the codefendant are admissible. The statement must satisfy the statutory definition and the trustworthiness requirement. "This necessarily requires a 'fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved . . . .' [Citation.]" (*Greenberger, supra,* 58 Cal.App.4th at p. 332.)

Here, our independent review of the circumstances surrounding Sergio's statements confirms that his statements bear sufficient indicia of trustworthiness and fall within the declaration against interest exception. Sergio's statements were specifically disserving of his penal interest. His statement to David "bragg[ing] about his part" and "admitt[ing] [his] involvement" patently disserves his penal interests. The same is true of his statements to Adan about Arceo's part in the murders; he told Adan that, when he (Sergio) was going to shoot San Miguel, Arceo said that he would take care of her and Sergio handed him the gun, clearly subjecting Sergio to criminal liability for the second murder.

The trustworthiness of Sergio's statements is equally clear. In addition to the "reasonable assurance" of the veracity that ordinarily flows from a person's interest in not being criminally implicated (*People v. Spriggs, supra,* 60 Cal.2d at p. 874), the circumstances surrounding Sergio's statements confirm their reliability. Sergio's statements were not made in a custodial context or in any other context remotely close to "an accomplice's statements that shift or spread the blame" to another. (*Lilly, supra,* 527 U.S. at p. 133.) Instead, Sergio's statements were made in " 'the most reliable circumstance,' " that is, " 'one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures.' "[14] (*Cervantes, supra,* 118 Cal.App.4th at p. 175, quoting *Greenberger, supra,* 58 Cal.App.4th at p. 335, citing cases.) We have no hesitation in concluding that, on the

---

[14] Arceo suggests that Sergio and Mejorado may not have been speaking to David and Adan in the capacity of friends in a noncoercive setting, saying that the "likely thinking" of Sergio and Mejorado was to notify David and Adan of the killings so they would not be surprised and act rashly (as cleanup and disposal of the bodies without the awareness of David and Adan was unlikely). This appears to be rank speculation, but if it were so, the statements likely would be admissible (as respondent argues) as statements in furtherance of a conspiracy, a "firmly rooted" exception to the hearsay rule requiring no separate analysis of trustworthiness.

circumstances presented by this record, Sergio's statements to David and Adan qualified as declarations against interest and were " 'so trustworthy that adversarial testing would add little to [their] reliability . . . .' " (*Cervantes, supra,* 118 Cal.App.4th at p. 177, quoting *Idaho v. Wright* (1990) 497 U.S. 805, 821 [111 L.Ed.2d 638, 110 S.Ct. 3139].)

### (b) *Mejorado's statement to Adan*

Arceo also challenges the admission of a statement by Mejorado to Adan to the effect that Sergio and Arceo perpetrated the Sanchez and San Miguel murders. This statement was elicited during Adan's cross-examination by counsel for Borjas to show inconsistencies in Adan's statements to the police. We agree with respondent that Mejorado's statement to Adan—that Sergio and Arceo committed the murders—was admissible as a statement by Mejorado in furtherance of a conspiracy.[15]

■ Hearsay statements by coconspirators may be admitted against a party if independent proof of a conspiracy has been shown, and three preliminary facts are established: " '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.' [Citation.]" (*People v. Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781].) "[W]hether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case." (*Id.* at p. 146.)

As respondent points out, Mejorado, Arceo and the others were charged with conspiracy to murder San Miguel and Sanchez, and the prosecutor specifically alleged that overt acts in furtherance of the conspiracy included transporting the victims' bodies to Tulare County and burning the bodies. The "totality of the facts and circumstances" (*People v. Hardy, supra,* 2 Cal.4th at p. 146) shows that the conspiracy extended to concealing the bodies of the victims. The evidence showed that when Adan woke up on the morning San Miguel and Sanchez were killed, he saw San Miguel's body wrapped in a blanket behind the couch, and "freaked out." It is reasonable to infer that,

---

[15] Evidence Code section 1223 states: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

because Adan saw one of the bodies, Mejorado had to explain what had happened in order to have Adan join in the conspirators' efforts to clean up the house, dispose of the bodies and otherwise conceal the murders.

■ Arceo concedes that the scope and extent of a conspiracy and its objectives is a question of fact for the jury,[16] but insists there was "no evidence that Arceo was part of a conspiracy to conceal the murders by cleaning up the garage or disposing of the bodies." Therefore (Arceo contends) Mejorado's statements were not made "prior to or during" the conspiracy to which Arceo was a party (the murders themselves). But no evidence that Arceo himself was "a participant in the cleanup or disposal of the bodies" was necessary. The scope of the conspiracy was for the jury to decide, and a conspirator is liable for the acts of his coconspirators until he effectively withdraws from the conspiracy. There was not the slightest evidence Arceo communicated to his cohorts any rejection or repudiation of the continuing conspiracy to dispose of the bodies.

In any case, even if Mejorado's statement had been inadmissible, Adan's testimony on this point was cumulative and harmless beyond a reasonable doubt. (See *People v. Burney* (2009) 47 Cal.4th 203, 232 [97 Cal.Rptr.3d 348, 212 P.3d 639] [*Bruton/Aranda* error is scrutinized under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; " 'if the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless.' [Citation.]"].) Here, the jury heard properly admitted testimony that Arceo himself told both David and Adan that he shot one of the victims, and that Sergio told both David and Adan the same story. Under these circumstances, it is inconceivable that the jury would not have convicted Arceo in the absence of Adan's additional statement that Mejorado told him the same thing.

---

[16] Adan's statement to the police (his first, on Apr. 29, 2005) indicated that after he saw Sanchez's body, he left to go to a friend's house, and his conversation with Mejorado, in which Mejorado told him that he did not kill the girls and it was Arceo and Sergio who did so, occurred a day or two after the murders. But Adan admitted he lied to the police in this first statement (and that he was at the Lopez house and helped clean up after the bodies were taken away). Consequently, the jury could properly conclude that the conversation occurred during the time Adan and others were cleaning up after the murders. That issue was for the jury to decide; it was properly instructed under CALJIC No. 6.24 that evidence of a statement made by one conspirator (here, Mejorado) against another (Arceo) was not to be considered unless the jury determined "[t]hat the statement was made in furtherance of the object of the conspiracy and was made before or during the time when the party against whom it was offered was participating in the conspiracy."

b., c.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Mejorado**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are affirmed.

Bigelow, P. J., and Rubin, J., concurred.

On May 12, 2011, the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied August 10, 2011, S193125.

---

*See footnote, *ante*, page 556.