Filed 10/27/14  P. v. Lee CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>BRIAELL MICHAEL LEE,<br><br>　　Defendant and Appellant. | B252982<br><br>(Los Angeles County<br>Super. Ct. No. VA081176) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Respondent.

_____

## INTRODUCTION

Briaell Michael Lee appeals from a judgment and sentence, following his conviction for second degree murder. He contends that the trial court erred in admitting hearsay testimony; that he was denied a fair trial due to the composition of the jury pool; and that the trial court erred in declining to instruct on duress as a defense to murder. Finding no reversible error, we affirm.

## PROCEDURAL HISTORY

Appellant and codefendant Cimarron Bernard Bell were charged with the murder of Mario Larios, Edgar Valles, and Fernando Pina (Pen. Code, § 187, subd. (a)).[1] Appellant was tried after Bell. A jury found appellant guilty of the murder of Larios, found the murder to be in the second degree, and found true the allegations that appellant personally and intentionally used and discharged a firearm (§ 12022.53, subds. (b), (c), (d) & (e)(1)). Appellant was found not guilty of the murder of Valles and Pina. The trial court sentenced appellant to 15 years to life for the murder, plus 25 years to life for the section 12022.53, subdivision (d) allegation. Appellant filed a timely notice of appeal.

## FACTUAL BACKGROUND

On January 30, 2004, the bodies of Larios, Pina, and Valles were found inside a white Mercedes, dead from gunshot wounds. A firearms examiner determined that bullets recovered from Larios and Pina were fired from a Rohm revolver. He also determined that a bullet recovered from Valles was fired from a Smith and Wesson revolver.

### A.    *Neysa Wyatt's Testimony*

Neysa Wyatt, Bell's girlfriend at the time of the murders, testified at the trials of appellant and Bell. According to Wyatt, in early 2004, Bell placed some

---

[1]     All further statutory citations are to the Penal Code.

2

ads to sell his Chevy Monte Carlo for $8,000 to $8,500, "way less than what the car was actually worth." On January 26, 2004, Bell called Wyatt to help him decipher a message from a potential buyer who spoke with an accent. Wyatt heard Bell and the buyer agree to meet to check out the Monte Carlo. The buyer said he would be driving a white "Benz."

Wyatt saw Bell driving the Monte Carlo the next day. When she asked about the potential buyer, Bell said that the buyer was interested but did not have all the money to purchase the car. The following day, when Wyatt was at Bell's house, she noticed some paint, lawn covering, and wall putty. In response to her inquiry, Bell said he had to fix some holes in the house.

A few days later, Wyatt saw a news report about dead bodies in a Mercedes Benz found at a location five to ten minutes away from Bell's house. She questioned Bell, and he stated that it was related to the potential buyer for the Monte Carlo. Bell told Wyatt that he never intended to sell the car. Bell had told appellant to wait in the back room of Bell's house until Bell returned with the potential buyers and to come out if called. After meeting with the potential buyer and two other men, Bell persuaded them to come to his house with the excuse that he did not want to count large amounts of cash in public. As soon as the three men walked through the door, Bell started shooting, but one of the men tried to get away. Bell yelled for appellant to come out and "take this other guy out." Appellant fired two shots but missed, putting holes in the wall. Bell pointed his gun at appellant and told him, "[I]f you don't take him out, I am taking you out." Appellant fired two more shots, and hit the victim, who was begging them not to kill him.

B.    *Appellant's Statements*

Appellant was interviewed by the police on three occasions. In the first two interviews, appellant admitted being present during the shootings, but denied

3

shooting anyone. In the last interview, appellant stated that he was attempting to leave during the shooting when Bell, armed with two guns, stopped him. Bell put a gun in appellant's hand, and had the other gun pointed at appellant. Appellant stated that he had no personal desire to shoot the victim. However, he felt he would be shot by Bell if he did not shoot the man. Appellant initially missed the man because he was nervous. Later shots hit the victim. Appellant acknowledged, that, "a murder is a murder. If I shoot this dude, I killed him." Appellant told police that he looked up to Bell as a brother. He thought Bell was cool, and Bell had taken good care of him.

On March 11, 2011, a letter, said to be from appellant, was received by the judge in Bell's trial. In the letter, appellant stated that he and Wyatt committed the murders, that Bell was not home at the time they were committed, that the plan was created by Wyatt, and that Bell was innocent. At Bell's trial, appellant appeared, but was not called as a witness.

C.    *Evidence Discovered at Bell's Residence*

On February 13, 2004, law enforcement searched Bell's residence and the Monte Carlo. In the living room, officers documented two patched areas covering up what appeared to be bullet holes. Blood stains matched to Valles and Larios were found in multiple locations in the house. Pina was a potential contributor to a blood sample found on the garage floor. A Rohm .38 gun was found in the garage. A loaded .357 Smith and Wesson revolver was found concealed in a secret compartment in the Monte Carlo.

A three-page document of Bell's notes related to calls received on his pager was recovered by officers. One of the entries had Larios's phone number and the notation, "Monte Carlo, white Benz." Phone records showed Larios made calls to Bell's pager on days before the murders, and on the morning of the murders.

4

## DISCUSSION

After examining the record, appointed appellate counsel filed a brief raising no issues, but asking this court to independently review the record on appeal pursuant to *People v. Wende* (1979) 25 Cal.3d 436, 441-442. (See *Smith v. Robbins* (2000) 528 U.S. 259, 264.) Appellant filed a supplemental letter brief, asking this court to consider three contentions: (1) that the trial court erred in admitting Wyatt's testimony; (2) that appellant's right to a fair trial was violated because the jury pool consisted almost entirely of Hispanics and the victims were Hispanic; and (3) that the court erred in not instructing on duress as a defense to murder, as requested by defense counsel.

A.  *Wyatt's Testimony*

Appellant contends that Bell's statements to Wyatt about appellant's involvement in the murders should have been excluded as hearsay evidence. We disagree, as Bell's statements fell within the declaration against penal interest exception to the hearsay rule in Evidence Code section 1230 (section 1230). Bell's admissions that he pointed a gun at appellant, ordered appellant to shoot the third victim, and observed the shooting were statements against Bell's penal interest, as they subjected him to criminal liability. Thus, Bell's admissions were admissible. (See, e.g., *People v. Arceo* (2011) 195 Cal.App.4th 556, 576 [codefendant's "bragging . . . about his part in the murders" and his description of his and appellant's actions subjected codefendant to criminal liability; statements were admissible under section 1230]; *People v. Marcus* (1974) 36 Cal.App.3d 676, 679 ["extrajudicial statements by two women that defendant . . . had admitted to them that he was involved in the robbery" admissible as statements against penal interest].) Moreover, Bell's admissions had sufficient indicia of trustworthiness and reliability, as he made them in private to a girlfriend at his residence. (See *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 [in determining

trustworthiness of statements, "the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others," and "the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"].) In sum, the trial court did not err in admitting Bell's statements through Wyatt's testimony.

B.   *Jury Pool*

Appellant contends he was denied a fair trial, as the jury pool consisted almost entirely of Hispanics, and the jury ultimately selected included only one Black juror. Appellant does not contend that the prosecutor improperly used peremptory challenges to exclude Black jurors. Rather, appellant argues he was denied a jury drawn from a representative cross-section of the community. "Under the federal and state Constitutions, a criminal defendant is entitled to a jury drawn from a representative cross-section of the community." (*People v. Howard* (1992) 1 Cal.4th 1132, 1159.) "'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'" (*Ibid*., quoting *Duren v. Missouri* (1979) 439 U.S. 357, 364.) Appellant has not established a prima facie case, as he failed to present evidence (1) that the representation of Black jurors was not fair and reasonable in relation to the community, or (2) that the underrepresentation was due to systematic exclusion of Black jurors. In short, appellant's challenge fails for want of evidence.

C.   *Duress*

At trial, defense counsel argued that appellant lacked intent to kill, as he shot

6

the victim under duress.  Defense counsel also sought an instruction on duress as a defense to murder, but the trial court refused to give one.  Appellant now contends the court erred by declining to give the instruction.  We disagree.  In *People v. Anderson* (2002) 28 Cal.4th 767, our Supreme Court held that duress is not a defense to murder.  (*Id*. at pp. 770, 780 [duress is not a defense to any form of murder, and cannot reduce murder to manslaughter].)  Thus, there was no error in refusing to instruct the jury on duress as a defense to the murder charges.

This court has examined the entire record in accordance with *People v. Wende*, *supra*, 25 Cal.3d at pages 441-442, and is satisfied appellant's attorney has fully complied with the responsibilities of counsel, and no arguable issues exist.  Accordingly, we affirm the judgment of conviction.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


MANELLA, J.


We concur:



EPSTEIN, P. J.                                    COLLINS, J.


7