Filed 8/28/14  P. v. Trejo CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HECTOR TREJO et al.<br><br>    Defendants and Appellants. | F064073 & F064085<br><br>(Fresno Super. Ct. No. F10905342)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Kat Kozik, under appointment by the Court of Appeal, for Hector Trejo, Defendant and Appellant.

Solomon Wollack, under appointment by the Court of Appeal, for Manuel Villanueva, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Carlos Rodriguez (Carlos) and Eduardo Alvarado (Eduardo), members of a Sureño gang, were fatally shot in a drive-by shooting in Reedley.  Both victims had just turned

16 years old. Appellants/defendants Hector Trejo and Manuel Villanueva, members of the Norteño Vario East Side Reedley (VESR) gang, were arrested for the murders based on information provided by Cesar Garcia, an informant within the VESR gang. Defendants told Garcia they selected the victims at random and committed the murders in retaliation for the unrelated murder of a young member of VESR by a Sureño.

After a joint jury trial, defendants were convicted as charged of counts I and II, first degree murder (Pen. Code, § 187, subd. (a)),[1] and the jury found true the firearm allegations (§ 12022.53, subds. (b), (c), (d), (e)(1); § 12022.5, subd. (a)(1)) and gang enhancements (§ 186.22, subd. (b)(4)(B)). The jury also found true the special circumstances of multiple murder, and that the murders were intentional and perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subds. (a)(3), (a)(21)).

Both defendants were sentenced to life without parole (LWOP) for counts I and II, plus 50 year for the firearm allegations.

Defendants filed separate notices of appeal and appellate briefs. Their cases have been administratively consolidated, and they have joined in each other's appellate issues. They contend the court erroneously denied their motions to exclude the testimony and tape recordings provided by Cesar Garcia, the gang informant, about his separate conversations with them, in which they implicated themselves and each other of committing the murders. Defendants argue the informant's evidence in this joint jury trial violated their Sixth Amendment confrontation rights as set forth in *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and *Crawford v. Washington* (2004) 541 U.S. 36, 61 (*Crawford*).

Defendants also argue the court abused its discretion when it denied their motions to exclude evidence that Villanueva was found in possession of a revolver during an unrelated traffic stop, because the weapon was not conclusively linked to the murders.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

They raise several allegations of prosecutorial misconduct during closing rebuttal argument, and assert these alleged cumulative trial errors violated their due process rights.

Finally, they contend their LWOP sentences must be reversed based on *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*), which held that life sentences for juveniles who are under the age of 18 years when they commit the offenses violate the Eighth Amendment. Defendants assert they are within the classification of juveniles contemplated by *Miller* because Trejo was 19 years old, and Villanueva was 18 years and 2 days old, when the murders were committed.

We affirm.

## FACTS

On the evening of April 1, 2009, M. was walking near Camacho Park in Reedley. She noticed two boys were riding together on a single bicycle. They stopped at the corner to wait for traffic to clear so they could cross the street. One boy stood on the bicycle pedals and the other boy sat behind him. The boys were later identified as Carlos Rodriguez (Carlos) and Eduardo Alvarado (Eduardo). Both were 16 years old and members of the Sureño gang.

M. also saw a white pickup truck drive past her at a high rate of speed. There were two men in the truck. The driver was about 18 or 20 years old. The truck had a blue pinstripe along the side. It also had two metal "tubes" or bars in the back, and she thought there might have been lights on top of the bars.

The truck headed toward where the boys were waiting to cross the street. When the truck was within five feet of the boys, M. saw and heard gunshots fired from the driver's side of the truck. The driver used a black and chrome gun. She saw both boys fall to the ground. The driver shouted something as he drove away at a high rate of speed.

M. told a neighbor to call the police and said the shots were fired from a white truck with blue lines.

## The victims

Around 8:00 p.m., officers from the Reedley Police Department responded to the shooting scene. Carlos and Eduardo were lying on the street, and they were unresponsive.

Carlos had suffered a single gunshot wound to the back of his head. The bullet entered the right side of the back of his head and lodged in the brain. Carlos's body was still straddling his bicycle where he fell. He was wearing a white T-shirt and jeans.

Eduardo was lying on his back, about five yards away from Carlos. He had a single gunshot wound to his back. The bullet entered his back, near the right shoulder blade, passed through the lungs and heart, lodged in his body, and caused internal bleeding. He was wearing a white T-shirt over a black shirt, and khaki colored pants.

Eduardo did not have a pulse, but Carlos was still breathing. Both victims were transported to the hospital, where they later died.

## Forensic evidence

There were no expended bullet or cartridge casings found at the scene. A revolver would not have left any casings.

The fatal bullets fired into victims were recovered from their bodies. The criminalist determined both were .22-caliber copper-washed lead bullets, with poor measurable details. Eduardo had been killed with a hollow-point bullet fired from a gun with a right twist. The bullet recovered from Carlos had less detail. Based on the condition of the bullets, the criminalist believed they were fired from a gun that was either worn and/or dirty.

## THE INFORMANT

After the initial investigation, the police did not have any leads or suspects in the murders. The situation changed after a confidential informant within the gang began to work for law enforcement officers.

At the time of trial, Cesar "Huero Loco" Garcia was 27 years old. He had been a member of the VESR gang since he was 13 years old. He had prior convictions for domestic violence, carrying loaded firearms, and driving under the influence, and served time in prison. He had been included in the gang injunction in Reedley.

Garcia testified the VESR gang sold marijuana, methamphetamine, heroin, and cocaine. There were 80 to 120 members. Garcia testified the Norteños were part of Nuestra Familia and had a very structured leadership and ranking system, across different generations of members, both in jail and on the streets. Garcia achieved a leadership rank from Nuestra Familia as the "overall" person in charge of the Norteños when he was at the Fresno County Jail. After he was released, he was considered a "seasoned soldier" in the streets. Garcia testified the Norteño system was "all just a bunch of propaganda they feed you. They brainwash you."

After a senior Norteño was incarcerated, Garcia became a member of the VESR "council," along with Joey Luna and Pablo Chavez. The council governed the VESR gang members in Reedley. Garcia's council duties were to "basically keep the peace" within the gang, "investigate all incident reports, to investigate everybody that's getting released from prison, from county jail, from juvenile hall, making sure that the paperwork is legit. Making sure it is not fabricated. Making sure that people are not using hard drugs in the streets … that people are not sleeping with other members' wives. That people are … giving in 10 percent of drugs and so on."

Garcia visited lots of Norteños to conduct these investigations, and he heard about murders and other violent crimes committed for the VESR's benefit. The council would talk to all the interested parties and not "go off hearsay." The council expected members

5.

to state the facts truthfully and without bragging to assure gang loyalty, or risk expulsion. If the council determined that a Norteño broke a gang rule, the disciplinary measures could include a fine, an assault, or removal from the gang.

Garcia testified the Southsiders, Sureños, and Bulldogs were the rivals of VESR. "As a whole," the Norteños fight for territory and elimination of rivals so "you can move in and sell" drugs. When a Norteño commits a violent crime against a rival, it shows the level of violence that person will commit, but will not increase that person's rank within the gang. However, "the more murders you commit … the better the chance the gang has an opportunity to move into that neighborhood, blend in with that neighborhood and … take over their drug trade."

Garcia testified it would not benefit a gang member if the council discovered that he had lied about committing a murder or other violent crime.

> "[T]his organization … is a close knit race. That's what it comes down to. We're a collective. We're a unit. We're an army. [T]here's no way in any shape or form that we would allow someone who is not loyal to us. We got to make sure those people are dedicated and committed to us, therefore, if we find out that a person would be lying, you know, we don't need that type of person, because it is not what you do for the gang, it is where you stand."

A Norteño who lied about committing a crime would be removed from the gang. "Removal" could mean an assault, stabbing, or death.

**Garcia's request for witness protection**

In January 2010, Garcia had just been released from prison and decided that he wanted to get out of the gang for the sake of his family. Garcia contacted Detective Kyle Kramer, a gang investigator, and said he was willing to risk his life to inform on the Norteños to change things for himself. Garcia did not ask for money or to work off any pending charges. Garica knew it was an act of treason to inform against the gang, he could be killed for it, and he would be a target for the rest of his life.

Garcia admitted he had an affair with the wife of another gang member. Garcia denied that he faced possible retribution for this conduct, there was a "hit" placed on him, or this was the reason he wanted to get out of the gang.

Detective Kramer testified he agreed to use Garcia as an informant in exchange for placing him in the witness relocation program. At Kramer's direction, Garcia spent nine months gathering information about the murders of Carlos and Eduardo. Kramer fitted Garcia with a concealed recording device. Based on his position in the council, Garcia contacted Trejo and Villanueva to talk about the murders. Garcia recorded every conversation and turned them over to Detective Kramer. After he finished his assignment, Garcia and his family were placed in the witness relocation program. At that point, he received over $2,000 per month for relocation expenses for housing and food.

Detective Kramer testified Garcia was not paid while he was gathering information, except that Kramer gave him gas money. While Garcia was working for Kramer, however, he was arrested for driving under the influence, driving without a license, and evading arrest, and violated his parole. Garcia pleaded guilty to a misdemeanor and he was released from custody. Kramer contacted parole authorities, explained Garcia's work as an informant and arranged for him to be placed on a GPS tracker for the parole violation instead of being returned to prison.

**Garcia's first conversation with Trejo**

On April 19, 2010, Garcia and Pablo "Creeper" Chavez, another member of the council, went to Trejo's house near Reedley. Garcia knew that Trejo was a "full functioning" Norteño. Garcia and Chavez talked to Trejo under the council's authority. There is no evidence that Chavez was an informant or aware of Garcia's agreement with the police.

Garcia and Chavez had a lengthy conversation with Trejo about a variety of gang-related and personal topics. Garcia also asked Trejo about the murders of the two boys in Reedley. Trejo showed them a white truck with blue pinstripes that was parked at his

house.  The truck had a metal rack mounted on the back for work purposes.  Trejo said he drove the truck that day, and he needed to get rid of it.

Trejo said he was in the truck with "Little Homie, Manuel."  Garcia believed he was referring to Villanueva, who was also a member of VESR.  Garcia asked Trejo why they "roll[ed] up on 'em" and whether they had a plan.  Trejo said they did not have a plan, but they went to "down those … southsiders."  The Southsiders were right there, and they shot "one of them in the face .…  He turned around."  Trejo said the parents of one victim worked for Trejo's father as farm laborers.

**Garcia's second conversation with Trejo**

On April 27, 2010, Garcia again met Trejo while he was wearing the recording device.  The recording was played for the jury.  Garcia and Trejo talked about several other gang matters.

Garcia changed the subject to the Reedley murders, and asked Trejo to again explain how they had pulled it off.  Trejo said he and "little homie Manuel," referring to Villanueva, went around "just looking for fools."[2]  Trejo said they were looking for "Penguin," a rival Sureño gang member, for some target practice.  Trejo said he was driving and Villanueva was sitting on the passenger side.  Trejo told Villanueva that they would drive around to find a rival gang member, and one of them would shoot depending on which side of the truck the rival was.  Villanueva responded, " 'Mando,' " which meant "mandatory."

Trejo said they saw Penguin with two other people.  Villanueva opened the truck's door and said he was going to "dome" Penguin, meaning that he was going to shoot him

---

[2] During both conversations with Garcia, Trejo referred to his associate as "little homie Manuel."  Garcia testified he believed Trejo was talking about defendant Manuel Villanueva.  In this second conversation, Garcia asked Trejo if Manuel was known as "Bookworm," which was the moniker of Villanueva's brother, Ricardo.  Trejo replied: "Nah, Manuel, his bro, his little brother," clarifying that "little homie Manuel" was defendant Villanueva.

in the head.  Trejo said not to shoot because there were witnesses.[3]  Trejo said he decided to drive into the country so they could smoke marijuana, but "we saw some fools mobbing on a bike."

Trejo said the two "fools" were waiting to cross the street.  Trejo said he pulled up close to them and he started shooting.  Trejo said he shot the first "fool," who was pedaling the bike.  Trejo said he hit him "in the dome," referring to his head, and he fell down.  Trejo thought he hit the first victim in the face or cheek.  The "other fool" was "booking it" down the street, and he quickly fired additional shots.

Trejo said after the shooting, he shook hands with Villanueva and declared "that was for Joel, bro," referring to Joel Medina, a teenage Norteño who was killed by Sureños in 2008.  Villanueva replied, "mando," meaning mandatory.[4]

Garcia told Trejo that he needed to get rid of the white truck.  Trejo again said the father of one of the victim's worked for Trejo's father, and he feared the victim's father would bring Sureños there to check it out.

**Villanueva's revolver**

On June 23, 2010, over a year after the murders, Tulare County Sheriff's Deputy Hector Rodriguez performed a traffic stop on a sedan in Sultana because he noticed the passenger vehicle had a commercial license plate.

There were two people in the car.  Ricardo Villanueva was driving, and his brother, defendant Manuel Villanueva, was the passenger.  Deputy Rodriguez asked the occupants to get out of the car, and whether they had any contraband or weapons.  Defendant Villanueva said he had something in his pocket.  Rodriguez conducted a patdown search and found an unloaded .22-caliber Sentinel cylinder revolver in

---

[3] Detective Kramer testified the only "Penguin" he knew was a Sureño named Jose Urritia.  However, Urritia was in jail on April 1, 2009, the day of the murders.

[4] Carlos and Eduardo, the victims in this case, were never suspects in Medina's murder.

defendant Villanueva's pocket, and small bag which contained eight live .22-caliber rounds. Rodriguez determined the license plate was not registered to that vehicle, but the car was not stolen.

The criminalist testified Villanueva's handgun was a black .22-caliber revolver, with a nine-cartridge cylinder and a brown grip. It did not automatically expel bullet or cartridge casings. It was not clean, and contained gun powder in the chamber and heavy lead "fouling" in the barrel. The criminalist test-fired the weapon and determined it operated normally. The gun barrel had a right twist. The fired bullets were of poor measurable detail because of the gun's dirty condition.

The criminalist could not eliminate the .22-caliber revolver as firing the fatal bullets. However, she could not conclusively make that determination based on the conditions of the gun and the bullets. The criminalist conceded that a right twist was more common than a left twist on a .22-caliber revolver. The criminalist further conceded there were approximately 250 kinds of .22-caliber pistols, and thousands and possibly millions of these firearms in circulation.

**Garcia talks to Villanueva**

The record implies that Villanueva was not held in custody after the traffic stop. In the meantime, Garcia decided to talk to Villanueva about the information provided by Trejo.

On August 2, 2010, Garcia asked Villanueva to come to his house because he was investigating a turf conflict between Villanueva and another person. Trejo was not present during this conversation.

During their conversation, Garcia asked Villanueva about the murders of the two boys. Villanueva said they didn't really plan it, but they just decided to see "what's cracking, see if we catch anyone" to use as a target. Villanueva said it happened "last year," in 2009, on "the first or second of April," and it was by "Camacho Park."

10.

Garcia asked if they were in Villanueva's burgundy car. Villanueva said they used Trejo's work truck.[5] Villanueva described the shooting: "Just circled around the block and … we seen them fools on the bike. And it was either going to be on this side or on Hector [Trejo's] side, but it was on Hector's side." Villanueva said both "Southsiders" were on one bicycle, and the passenger was on the back pegs. "We just seen them and popped them." The "fool" sitting in the front of the bicycle was shot first, "in the dome I think," referring to his head. "[T]he other fool took off running and got popped in the back twice." Villanueva thought Trejo fired four or five rounds. Villanueva said Trejo had "good accuracy." After Trejo fired, he asked Villanueva if he got them and Villanueva said, "Mando."

Garcia asked Villanueva if they used a .44-caliber gun. Villanueva said it was a .22-caliber revolver. Garcia asked what happened to it. Villanueva initially said he did not know what Trejo did with the gun. As the conversation continued, Villanueva said Trejo gave the gun to "Baby Ene."

**The arrests and searches**

On October 26, 2010, Villanueva was arrested and the police searched his residence pursuant to a warrant. They found evidence of Norteño gang membership, including references for Joel Medina to rest in peace.

On the same day, Trejo was also arrested, and the SWAT team executed a search warrant at his parents' house. The police found an inert grenade launcher, an assault rifle, a 20-gauge shotgun, and cases of ammunition and shells. They also found a loaded .22-caliber revolver, but the prosecution never claimed this was the murder weapon.

---

[5] Garcia testified that he knew that Trejo had already identified the white truck, but he asked the question to see Villanueva's reaction.

**Expert testimony**

Investigator Kramer testified as the prosecution's gang expert, and explained VESR is a Norteño gang in Fresno County. The VESR's primary activities are drug possession, drug sales, drive-by shootings, assaults with deadly weapons, and murders.

The Bulldog Sureños were the rivals to the Norteño VESR. Carlos and Eduardo were both Sureño gang members. There was no evidence of prior personal conflicts between defendants and the victims.

Investigator Kramer testified the Norteño gang is as structured as a military organization. It would not benefit a young gang member to lie to a senior Norteño about his criminal activities because of the strong likelihood that his lie would be discovered.

Investigator Kramer testified to his opinion that Trejo and Villanueva were active members of the VESR Norteños, based on their prior self-admissions, possession of gang paraphernalia, tattoos, and jail classifications. He believed they committed the drive-by shooting of Carlos and Eduardo for the benefit of the Norteños, primarily in retaliation for the Sureños' murder of Joel Medina.

## DEFENSE EVIDENCE

Villanueva did not testify or introduce any defense evidence.

Trejo did not testify but introduced evidence in support of an alibi defense from his parents, relatives, and friends, who testified Trejo was at a family party on the afternoon and evening of the Reedley murders.

Trejo also called Eddie Amaya, who worked for Trejo's father. Amaya testified he saw the drive-by shooting of Carlos and Eduardo. The gunman was in a white Tahoe SUV. Amaya was familiar with Trejo's white pickup truck, and insisted the gunman was not in that vehicle. Amaya testified there were two men and a woman in the white Tahoe. The gunman fired from the back seat and shot the two boys on the bicycle. A black car was also in the area and appeared to be with the white Tahoe. Both vehicles burned rubber as they drove away. Amaya claimed he tried to talk to the police that night

12.

but the officer wasn't interested.  Amaya conceded he did not tell anyone about this information until a few weeks before Trejo's trial.

**Defense expert**

Martin Sanchez-Jankowski testified as the defense expert in criminal street gangs. He was a professor of sociology with an emphasis on poverty and violence.  He did not know anything about the VESR gang but testified generally about the behavior of the Norteño and Sureño gangs.  He believed it was not unusual for a young gang member to lie about committing a crime to earn respect, stature, and female attention.  The gang member would decide the benefits of lying were greater than the risks, depending on the likelihood of discovery.  The Norteños did not have an incentive to investigate false claims if they did not negatively impact the gang.  A false claim about killing a Sureño would benefit the gang.  Even if the lie was discovered, there might not be consequences if sufficient time has passed.  He conceded the gang member could be severely punished if he lied to a senior member.  If the lie negatively impacted the gang or attracted police attention, the liar could be beaten or killed.  He conceded, however, that evidence gathered by an undercover informant within a gang would be the most reliable information about the gang's activities.

## DISCUSSION

### I. Admission of Garcia's testimony and recordings

Both defendants contend the court committed prejudicial error when it denied their motions to exclude Garcia's testimony and recordings of his extrajudicial conversations with them.  Defendants argue the admission of the evidence violated their confrontation rights in this joint jury trial pursuant to the Sixth Amendment and *Aranda/Bruton*, because Trejo's statements to Garcia implicated Villanueva, Villanueva's statements to Garcia implicated Trejo, both defendants declined to testify, and they were not subject to cross-examination.  Defendants further argue the inculpatory extrajudicial statements were inadmissible testimonial hearsay under *Crawford*.  In the alternative, defendants

13.

argue that even if their statements to Garcia were not testimonial, the hearsay statements were inadmissible as declarations against interest because their statements were unreliable.

## A. **Background**

Trejo filed a pretrial motion to exclude Garcia's recording of his conversation with Villanueva on August 2, 2010, where Villanueva implicated Trejo in the murders. Villanueva similarly moved to exclude Garcia's recordings of his two conversations with Trejo, on April 17 and 27, 2010, where Trejo implicated Villanueva. In the alternative, Villanueva moved for severance of their joint trial because of the prejudice inherent in Garcia's evidence against them.[6]

The court heard extensive arguments from the parties on these issues over the course of two hearings, and asked for and received additional briefing. Both defendants argued Garcia's recordings violated their right to confront and cross-examine witnesses, as set forth in *Bruton*. They also argued their hearsay statements were testimonial and inadmissible under *Crawford* because Garcia was a paid agent of the police, and engaged in an orchestrated attempt to get the defendants to implicate themselves in the murders.

In opposition, the prosecutor argued the defendants' extrajudicial statements to Garcia did not violate *Crawford* or *Bruton* because they were not testimonial, and their hearsay statements were admissible as declarations against the defendants' penal interests. The prosecutor conceded Garcia acted as an agent of law enforcement officers to obtain information from the defendants. However, the prosecutor cited to federal

---

[6] Both defendants also objected to the introduction of the statements they made to the police during their postarrest interrogations, in which they also inculpated each other. The prosecutor initially stated it would not introduce the defendants' postarrest interviews and conceded these were testimonial statements. The prosecutor subsequently attempted to introduce a redacted version of Villanueva's postarrest statement. In response, both defendants renewed their *Bruton* objections and severance motions. The postarrest statements were never admitted.

circuit cases which held that statements made to an unknown informant were not testimonial.

The court denied defendants' motions to exclude Garcia's testimony and the recordings. In doing so, the court primarily relied on *People v. Arceo* (2011) 195 Cal.App.4th 556 [rev. den., cert. den.] (*Arceo*) and a series of post-*Crawford* cases, which held that *Bruton's* confrontation clause concerns did not apply when the declarant's extrajudicial statements were not testimonial, and a declarant's statements to an unknown informant were not testimonial because such statements were trustworthy and reliable if made between friends in a noncoercive setting.

The court found the defendants' made these statements to Garcia in noncoercive settings, such as their own homes and Garcia's home. The defendants did not believe they were speaking to a police officer, but they were talking among friends and associates about what they did.

The court further held defendants' nontestimonial hearsay statements, in which they implicated each other, were admissible as declarations against their penal interests pursuant to Evidence Code section 1230. Their statements were trustworthy because in addition to implicating each other, each defendant admitted and described his own role in the murders. The court also denied Villanueva's motion for severance, since it was based on the *Bruton/Crawford* issues.

In response to the court's ruling, defendants argued their respective statements to Garcia were not trustworthy because Trejo said he shot the first boy in the cheek, but the evidence showed the first victim was shot in the back of the head. Trejo also claimed they were looking for and found a gang member, Penguin, in the street, and decided not to shoot him because witnesses were present. However, the police determined that Penguin was in custody on the night of the murders.

The court noted there were other portions of the defendants' statements which indicated they were reliable and trustworthy, particularly the description of the two

15.

victims on one bicycle, the first victim was pedaling, he was shot and immediately fell on his bicycle, the second victim tried to run away, and he was shot in the back as he ran.

## B. *Bruton*

We begin with the *Bruton* rule.  "A criminal defendant has a right, guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution, to confront adverse witnesses.  The right to confrontation includes the right to cross-examination.  [Citation.]  A problem arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial.  If the declarant codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine the declarant codefendant regarding the content of the confession."  (*People v. Lewis* (2008) 43 Cal.4th 415, 453, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912.)

"In *Bruton,* the United States Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant.  [Citation.]  The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'  [Citation.]  Such a context is presented when 'the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.'  [Citation.]"  (*People v. Lewis*, *supra*, 43 Cal.4th at p. 453.)

"Broadly stated, the rule of *Bruton* ... – which is rooted in the confrontation clause and accordingly governs state as well as federal prosecutions [citation] – declares that a

nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given. [Citation.]" (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120, superceded by statute on other grounds as explained in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 163, fn. 20.)[7]

In contrast, statements that incriminate a codefendant "only when linked with evidence introduced later at trial" can be admitted if references to the codefendant are redacted and the jury is instructed not to consider the statement against any defendant other than the declarant. (*Richardson v. Marsh* (1987) 481 U.S. 200, 208, 211.) In that situation, the jury is presumed to follow the instructions and consider the statement only for the proper purpose (assessing the declarant's guilt) and not the improper purpose (assessing the codefendant's guilt). (*Id*. at pp. 206–207.)

In this case, Garcia's testimony and recordings included his two conversations with Trejo, where he implicated himself and Villanueva in the murders; and Garcia's single conversation with Villanueva, where he implicated himself and Trejo in the murders. It would thus appear the confrontation clause concerns addressed by *Bruton* would be potentially relevant in a joint trial.

---

[7] In *Aranda*, *supra*, 63 Cal.2d 518, the California Supreme Court "anticipated the effect of *Bruton*" and held that "even if a limiting instruction is given it is error to admit at a joint trial a codefendant's extrajudicial self-incriminating statement when such statement inculpates another defendant." (*People v. Anderson, supra,* 43 Cal.3d at p. 1121.) "The premise of *Aranda* is essentially the same as that of *Bruton:* jurors should not be permitted to be influenced by evidence that as a matter of law they cannot consider but as a matter of fact they cannot ignore. [Citation.]" (*Ibid*.) To the extent that *Aranda* "constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 [citation]." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465, fn. omitted.)

## C. *Crawford*

As recognized by the trial court, the application of *Bruton's* confrontation clause concerns has been somewhat limited by *Crawford*, *supra*, 541 U.S. 36. In *Crawford*, "the United States Supreme Court held that the introduction of 'testimonial' hearsay statements against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses, unless the witness is unavailable at trial and the defendant has had a prior opportunity for cross-examination. [Citation.]" (*People v. Vargas* (2009) 178 Cal.App.4th 647, 653.) "Under *Crawford,* the crucial determination about whether the admission of an out-of-court statement violates the confrontation clause is whether the out-of-court statement is *testimonial or nontestimonial*." (*People v. Geier* (2007) 41 Cal.4th 555, 597, italics added.)

While *Crawford* mentioned *Bruton*, the court did not expressly address whether *Crawford's* discussion of testimonial hearsay overruled or replaced *Bruton's* analysis of the confrontation clause. (*Crawford*, *supra*, 541 U.S. at p. 57.) However, there is dicta in *Crawford* which strongly suggested the confrontation clause did not apply to nontestimionial statements. (*Id.* at pp. 60–61.)

While *Crawford* did not address *Bruton*, the United States Supreme Court has since held that *Crawford* eliminated "Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements." (*Whorton v. Bockting* (2007) 549 U.S. 406, 420 (*Whorton*).) Under *Crawford*, the Confrontation Clause has no application to "an out-of-court nontestimonial statement not subject to prior cross-examination," and such evidence is admissible "even if they lack indicia of reliability." (*Whorton*, *supra*, at p. 420.) Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*).) In contrast, nontestimonial statements do not "cause the declarant to be a 'witness' " within the meaning of the Sixth Amendment and thus are "not subject to the Confrontation Clause." (*Ibid*.)

The federal circuits have further developed this distinction. "The *Bruton*/*Richardson* framework presupposes that the aggrieved co-defendant has a Sixth Amendment right to confront the declarant in the first place. If none of the co-defendants has a constitutional right to confront the declarant, none can complain that his right has been denied. It is thus necessary to view *Bruton* through the lens of *Crawford* and *Davis*. The threshold question in every case is whether the challenged statement is testimonial. If it is not, the Confrontation Clause 'has no application.' [Citations.]" (*United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85, fn. omitted.) "Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements. [Citations.]" (*United States v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326; see also *United States v. Smalls* (10th Cir. 2010) 605 F.3d 765, 768, fn. 2 (*Smalls*); *United States v. Vargas* (8th Cir. 2009) 570 F.3d 1004, 1008–1009.)

The California Supreme Court has held a defendant's confrontation clause rights are violated only with the admission of *testimonial* hearsay statements made by a declarant/codefendant. (*People v. Loy* (2011) 52 Cal.4th 46, 65–67.) "Not all erroneous admissions of hearsay violate the confrontation clause. [Citation.] … Only the admission of *testimonial* hearsay statements violates the confrontation clause ...." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812, italics added.)

In *Arceo*, *supra*, 195 Cal.App.4th 556, the court addressed the application of *Crawford's* discussion of testimonial hearsay in light of *Bruton*. It reviewed the federal authorities discussed above, and noted that "a number of federal courts have expressly held that the *Bruton* rule does not apply to nontestimonial statements. [Citations.]" (*Arceo* at p. 574.)

> "In sum, from this body of law we can draw only one conclusion. *Crawford, Davis,* and *Whorton* mean what they say – the confrontation clause applies only to testimonial statements – and nothing in the cases applying that principle to extrajudicial statements by nontestifying

codefendants is inconsistent with or purports 'to overrule *Bruton*,' which itself did not address 'any recognized exception to the hearsay rule.' [Citation.]  Accordingly, if [the declarant's] statements to [the witnesses] … were admissible under state law as exceptions to the hearsay rule, there was no error in the admission of that testimony.  And, as California courts have held, ' "a declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness." '  [Citations.]" (*Id*. at pp. 575–576.)

### *Analysis*

As applied to the instant case, the superior court properly held the threshold question as to defendants' confrontation clause objections, based on *Bruton* and *Crawford*, was whether defendants' extrajudicial statements to Garcia were testimonial or nontestimonial.  *Davis*, *Whorton*, and the federal circuit's post-*Crawford* opinions have clearly distinguished confrontation clause issues depending upon whether the statements are testimonial or nontestimonial.  If the defendants' extrajudicial statements to Garcia were testimonial, then defendants' confrontation clause and severance objections were potentially valid.  If the evidence was nontestimonial, however, the confrontation clause was not implicated and the evidence was admissible if the statements otherwise satisfied a hearsay exception.

Defendants complain that the superior court improperly denied their *Bruton* objections by solely relying on *Arceo*, a "lower court" case which, they claim, erroneously held that *Bruton* had been overruled by *Crawford*.  Defendants argue that *Arceo* was bound to follow the United States Supreme Court's holding in *Bruton* unless it is expressly overruled.  While defendants concede that *Arceo* relied on the post-*Crawford* case of *Whorton*, they assert that *Whorton* did not "squarely address[]" whether *Crawford* had limited *Bruton*, and insist that *Bruton's* analysis of the confrontation clause cannot be ignored unless it is specifically disapproved by the United States Supreme Court.

In making this argument, however, defendants have not addressed the fact that the United States Supreme Court denied a petition for writ of certiorari in *Arceo*.

20.

Defendants' attack on *Arceo* also ignores the federal authorities which have concluded that *Crawford* limited *Bruton's* confrontation clause concerns to testimonial statements. Defendants have not addressed *Whorton's* specific finding that *Crawford* eliminated "Confrontation Clause protection against the admission of unreliable out-of-court nontestimionial statements," and that the confrontation clause has no application to "an out-of-court nontestimonial statement" even if the statement lacks reliability. (*Whorton, supra,* 549 U.S. at p. 420.) Defendants also fail to address *Davis's* declaration that only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause," and nontestimonial statements do not "cause the declarant to be a 'witness' " within the meaning of the Sixth Amendment and thus are "not subject to the Confrontation Clause." (*Davis*, *supra*, 547 U.S. at p. 821.)

### D. <u>Testimonial statements and informants</u>

We thus turn to the question of whether the defendants' extrajudicial statements to Garcia were testimonial or nontestimonial. *Crawford* offered a limited definition of what constitutes a testimonial statement for purposes of the confrontation clause:

> "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' [Citation.]" (*Crawford, supra,* 541 U.S. at pp. 51–52.)

In the course of its analysis, *Crawford* cited *Bourjaily v. United States* (1987) 483 U.S. 171 (*Bourjaily*), which involved a declarant/codefendant's unwitting statements to an FBI informant. In that case, the declarant implicated the defendant during conversations with the informant, which were recorded without the declarant's

21.

knowledge. *Bourjaily* held the admission of the declarant's statements did not violate the defendant's confrontation rights, even though the defendant did not have the opportunity to cross-examine the declarant, and the declarant was unavailable to testify at trial. (*Id.* at pp. 173–174, 182.)

*Crawford* approvingly cited *Bourjaily* as an example of an earlier case which was "consistent with" the principles that the confrontation clause permitted with the admission of nontestimonial statements, in the absence of a prior opportunity for cross-examination. (*Crawford*, *supra*, 541 U.S. at p. 58.)

*Crawford's* definition of testimonial statement was further addressed in *Davis*, which held certain statements made in response to questions from a 911 operator during an emergency were not testimonial: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822, fn. omitted.)

As in *Crawford*, *Davis* approvingly cited *Bourjaily* and held that "statements made unwittingly to a Government informant" are "clearly nontestimonial." (*Davis*, *supra*, 547 U.S. at p. 825.)

In light of *Davis*, the California Supreme Court "derive[d] several basic principles" to define statements as testimonial, including that "the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony – to establish or prove some past fact for possible use in a criminal trial[,]" and "the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the

conversation." (*People v. Cage* (2007) 40 Cal.4th 965, 984, italics in original, fn. omitted.)

There are a series of cases which discuss whether the statements of a declarant/codefendant to a confidential informant are testimonial within the meaning of *Crawford*. In *United States v. Saget* (2d Cir. 2004) 377 F.3d 223 (*Saget*), the court cited *Crawford's* approval of *Bourjaily* and held that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*" and were not testimonial. (*Saget, supra*, at pp. 229–230.)

*Saget* further held that the declarant's statements to the informant which implicated the defendant were reliable and admissible against the defendant. The declarant's statements to the informant were made "in circumstances that confer adequate indicia of reliability," since the declarant "believed he was speaking to a friend – their conversations included discussions of personal issues such as child support as well as details of [a] gun-running scheme – in a private setting. [Citation.]" (*Saget, supra*, 377 F.3d at p. 230.) The declarant described the methods he and the defendant used to operate their weapons scheme, and he was not "attempting to shift criminal culpability from himself to [defendant]." (*Ibid*.)

*Saget* rejected the defendant's claim that the declarant's statements were not reliable because the declarant purportedly had a motive to exaggerate his statements, so he could convince the informant to join the gun-running operation. (*Saget, supra*, 377 F.3d at p. 230.)

> "Although the CI asked [the declarant] fairly detailed questions about the logistics of the gun-running scheme, he never expressed doubt about the veracity of [the declarant's] statements or misgivings about joining the illegal activity. Moreover, those statements that incriminate [the defendant] … are factual in nature. Those elements of the statements that [declarant] might have exaggerated, such as the amount of money their partners made or the number of guns they purchased at once, are immaterial to [the

23.

declarant's] central assertion, that he and [the defendant] participated in the gun-running scheme…." (*Id.* at pp. 230–231.)

In *United States v. Hendricks* (3d Cir. 2005) 395 F.3d 173, the court relied on *Saget* and *Crawford's* approval of *Bourjaily*, and similarly held that "surreptitiously monitored conversations and statements contained in [wiretapped telephone calls and other] recordings are not 'testimonial' for purposes of *Crawford.* [Citations.]" (*United States v. Hendricks*, *supra*, at p. 181.)

In *United States v. Underwood* (11th Cir. 2006) 446 F.3d 1340 (*Underwood*), the court relied on *Saget* and noted that *Crawford's* definition of testimonial statements involved "statements made under circumstances which would lead the *declarant* to believe that the statement would be available for use at a later trial. [Citation.]" (*Underwood*, *supra*, at p. 1347, italics added.) *Underwood* held the declarant's recorded statements to a confidential informant were not testimonial under the circumstances:

> "In this case, the challenged evidence consisted of recorded conversations between the confidential informant [Hopps] and Darryl [the declarant] in which arrangements were made for the confidential informant to purchase cocaine. This evidence is neither testimony at a preliminary hearing, nor testimony before a grand jury, nor testimony at a former trial, nor a statement made during a police interrogation. Moreover, the challenged evidence does not fall within any of the formulations which *Crawford* suggested as potential candidates for 'testimonial' status. [Citation.] Darryl, the declarant in the challenged evidence, made statements to Hopps in furtherance of the criminal conspiracy. *His statements clearly were not made under circumstances which would have led him reasonably to believe that his statement would be available for use at a later trial.* Had Darryl known that Hopps was a confidential informant, it is clear that he never would have spoken to her in the first place." (*Id.* at p. 1347, italics added.)

In *Smalls*, *supra*, 605 F.3d 765, an inmate worked as a confidential informant and secretly recorded conversations with Cook, the defendant's accomplice who was also an inmate. Cook revealed details about the defendant's commission of murders. The defendant argued Cook's statements to the informant were testimonial because the

informant acted as an agent of the police and "interrogated" the accomplice. (*Id*. at pp. 778–779.) *Smalls* rejected this argument:

> "Cook's recorded statement to CI, known to Cook only as a fellow inmate, is unquestionably nontestimonial.… We cannot properly label Cook's encounter with CI as a custodial interrogation because '[t]he essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.' [Citations.]

> "Nor may we properly label CI's 'questioning' of Cook outside a custodial context as interrogation under any generally accepted definition or in any formal sense of that term. [Citations.] As we very recently explained in the companion case … [¶] "[T]here is no question that Cook spoke freely with the cooperating informant, was not coerced, and the circumstances surrounding their conversation were nothing akin to police interrogation. In our view, such casual questioning by a fellow inmate does not equate to "police interrogation," even though the government coordinated the placement of the fellow inmate and encouraged him to question Cook." (*Id*. at pp. 778–779.)

*Smalls* held the critical factors was not the nature of the informant's questions, "but on the nature of Cook's responses," based on *Davis's* holding that " 'even when interrogation exists, *it is in the final analysis the declarant's statements*, not the interrogator's questions, *that the Confrontation Clause requires us to evaluate*.' [Citations.]" (*Smalls*, *supra*, 605 F.3d at p. 779, italics added in original.) *Smalls* held Cook's statements were not formal declarations, "even to the slightest degree," and he did not make his statements to the informant "for the 'primary purpose' of establishing or proving facts relevant to a criminal prosecution. [Citations.]" (*Id*. at p. 779.)

> "Obviously, Cook would not have shared what he did had he known the Government was recording his statement or that his cellmate was a CI. [Citations.] Objectively viewed from Cook's standpoint, his statement was much more akin to casual remarks to an acquaintance than formal declarations to an official. [Citation.] Cook in no sense intended to bear testimony against Defendant Smalls; Cook in no manner sought to establish facts for use in a criminal investigation or prosecution. [Citation.] Cook boasted of the *details* of a cold-blooded murder in response to 'casual

25.

questioning' by a fellow inmate and apparent friend. [Citation.] Cook's statement is undoubtedly nontestimonial under any legitimate view of the law." (*Id*. at pp. 779–780.)

In *Arceo*, witnesses testified about inculpatory statements made to them by the nontestifying codefendants which implicated defendant in murders. The defendant argued the witnesses' testimony about the declarants' extrajudicial statements violated *Bruton* and *Crawford*. As explained *ante*, *Arceo* held that the confrontation clause objections did not apply to nontestimonial statements. *Arceo* further held the codefendants' hearsay statements, as recounted by witnesses' trial testimony, were admissible as declarations against interest. (*Arceo*, *supra*, 195 Cal.App.4th at p. 571.)

### *Analysis*

Defendants argue that even if *Bruton* is limited to testimonial statements, their statements to Garcia were still testimonial and inadmissible within the meaning of *Crawford* because Garcia was acting as a police agent pursuant to an agreement with the police to obtain information about gang crimes; he targeted defendants as suspects in the Reedley murders; he secretly recorded the conversations in exchange for placement in the witness relocation program; and he complied with Detective Kramer's instructions to gather more information from the defendants about the murders. As demonstrated by the cases discussed above, statements made to a confidential informant in casual circumstances, and not subject to the formality of a police interrogation, are not testimonial, even if the informant is working for the government and follows instructions to ask specific questions about specific crimes. Defendants engaged in casual conversations about a variety of topics, including the Reedley murders. These meetings occurred in noncoercive residential locations. There is no evidence that Garcia threatened or forced defendants to talk about certain issues, even in his position as a gang council member.

Defendants assert the lower federal court rulings about informants are inconsistent with a series of United States Supreme Court cases about whether particular forensic

26.

investigatory evidence and reports, obtained and prepared by law enforcement agencies, are testimonial within the meaning of *Crawford*. Defendants particularly cite to Justice Thomas's concurring opinions in these cases. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*); *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221].) Defendants also rely on *Michigan v. Bryant* (2011) 562 U.S. __ [131 S.Ct. 1143], and the court's reliance on an objective test for the "primary purpose" of a statement, to determine if it is testimonial.

As the California Supreme Court has more recently observed, however, the United States Supreme Court has consistently relied on certain factors in defining testimonial statements, none of which are implicated in this case:

> "The question of what out-of-court statements are and are not testimonial has divided the justices of the United States Supreme Court, whose decisions have not yet yielded a clear definition or test. But the justices have consistently considered two factors in deciding whether a given statement sufficiently resembles the English court abuses that gave rise to the confrontation clause, primarily the use at trial of witness statements obtained through ex parte examination: *(1) the degree of formality or solemnity with which the statement was made and (2) the degree to which it was produced for use at trial.* The more a statement resembles the ' "solemn declaration or affirmation" ' that is testimony, commonly understood, and the more it was expected, when made, ' "to be used prosecutorially" ... "at a later trial," ' the more centrally it is located within the 'core class of "testimonial" statements.' [Citation.]

> "Throughout the high court's exploration of the issue, Justice Thomas has maintained that solemnity or formality is the sine qua non of the testimonial statement.… Other opinions, primarily majority opinions, have relied on this factor as well. [Citations.]" (*People v. Dungo* (2012) 55 Cal.4th 608, 622–623, italics added.)

For the reasons explained in *People v. Dungo*, defendants' reliance upon *Bryant*, *Williams*, and *Melendez-Diaz* is misplaced given the circumstances of the instant case, where the extrajudicial statements were made to a senior gang member, during conversations in noncoercive settings, without any degree of solemnity or formality. The

27.

trial court properly denied defendants' *Bruton* and *Crawford* objections to Garcia's evidence.

### E.  Hearsay – Admissions

While defendants' statements to Garcia were not testimonial, the rules of evidence still apply to nontestimonial statements.  Thus, the evidence was admissible against each defendant only if their statements to Garcia were admissible under state law as exceptions to the hearsay rule.  (*Arceo*, *supra*, 195 Cal.App.4th at pp. 573–574.)

Defendants' hearsay statements to Garcia which implicated themselves constituted admissions.  "The hearsay rule does not bar statements when offered against the declarant in an action in which the declarant is a party.  (Evid. Code, § 1220.)  'The evidence was of statements, defendant was the declarant, the statements were offered against him, and he was a party to the action.  Accordingly, the hearsay rule does not make the statements inadmissible.' [Citation.]" (*People v. Horning* (2004) 34 Cal.4th 871, 898, fn. omitted.) This exception "covers all *statements* of a party, whether or not they might otherwise be characterized as admissions.  [Citations.]" (*Id*. at p. 898, fn. 5, italics in original.)

Trejo's statements to Garcia, in which he admitted that he drove the truck around to look for a Sureño, and he fired the fatal shots at both boys on the bicycle, were admissions as to Trejo.  Villanueva's statements to Garcia, in which he admitted that he was present when the two victims were shot, were also admissions as to Villanueva.

### F.  Hearsay – Declarations against interest

Defendants argue their hearsay statements which implicated each other were inadmissible:  Trejo's statements to Garcia which implicated Villanueva, and Villanueva's to Garcia which implicated Trejo.  However, the applicable hearsay exception in this case is found in Evidence Code section 1230, which provides, in relevant part, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal

28.

liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true."

"The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610–611.)

" 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] '[E]ven when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission.... [¶] ...We have recognized that, in this context, assessing trustworthiness " 'requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.' " ' [Citation.]" (*People v. Geier*, *supra*, 41 Cal.4th at p. 584, implicitly abrogated on another point in *Melendez-Diaz*, *supra*, 557 U.S. 305, as acknowledged in *People v. Houston* (2012) 54 Cal.4th 1186, 1220.)

"Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. 'Once partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited

disclosures. [Citations.] [¶] When examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another. This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest. [Citation.] This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances. [Citations.]" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335; *People v. Tran* (2013) 215 Cal.App.4th 1207, 1217.)

The court's evidentiary ruling is reviewed for an abuse of discretion, but we independently review the court's preliminary determination of trustworthiness. (*People v. Tran*, *supra*, 215 Cal.App.4th at p. 1218.)

1. ***Analysis***

Defendants' statements which implicated each other were declarations against their penal interests. Both defendants were unavailable as witnesses because they exercised their privileges against self-incrimination and did not testify at their joint trial. In addition, their statements subjected themselves to risks of criminal liability – Trejo admitted he fired the fatal shots and Villanueva was with him, and Villanueva talked about how he drove around with Trejo to look for some Sureños, that Trejo fired these shots, and that they shook hands on it after the murders. Both defendants admitted they intended to commit the murders, they were fully aware of the details, and they consistently described the role each of them played before, during, and after the fatal shootings.

Defendants argue their statements were not trustworthy or reliable to constitute declarations against interest because of discrepancies between their accounts and the prosecution's evidence about the murders, and they had motives to brag about their conduct because they believed Garcia was a senior gang member gathering information about their gang-related activities. Trejo argues Villanueva's statements, which implicated him as the gunman, were not reliable or trustworthy because he blamed Trejo for the murders as the gunman, and tried to minimize his own involvement as being limited to passively sitting in the truck while Trejo killed the two victims. Trejo argues Villanueva had ample motive to lie because he wanted Garcia, the senior VESR gang leader, to believe he was present during the double murder.

As Trejo concedes, however, the California Supreme Court addressed a similar issue in *People v. Valdez* (2012) 55 Cal.4th 82, when it held that statements made in private between gang members had sufficient indicia of trustworthiness to be admissible as declarations against interest. *Valdez* rejected the claim that a gang member would have no reason to believe a statement he made in private to another gang member could expose him to criminal prosecution. (*Id*. at p. 144.)

> " 'The question as to such declarations is whether under the circumstances the declarant would have been unlikely to say it had it not been true. To be against penal interest under the rule, the statement need not be made to persons who are likely to use it against the declarant in court proceedings. Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy.' [Citation.]" (*Ibid.*)

In this case, during the course of Garcia's conversations with both defendants, neither Trejo nor Villanueva attempted to absolve themselves or shift blame to the other person. (Cf. *People v. Duarte*, *supra*, 24 Cal.4th at p. 615.) Instead, each defendant explained how, what, where, and why they murdered the two victims: They drove around to look for any Sureño. They wanted to avenge the murder of a young Norteño

31.

friend, and they would decide which of them would fire based on which side of the car they found someone. They were looking for and found someone they believed was Penguin, but there were too many witnesses around. They saw two Sureños riding together on one bicycle. Trejo shot the front rider, and he collapsed on his bicycle. The second victim tried to run away, and Trejo fired additional shots into his back.

Defendants point to factual discrepancies in their statements as undermining their reliability and trustworthiness, primarily Trejo's declaration to Garcia that he shot the first victim in the face or cheek, and he shot the second victim twice in the back. These are minor factual distinctions based on the totality of the circumstances. Carlos, who was pedaling the bicycle, was shot once in the back of the head and fell to the ground while still straddling the bicycle seat. Eduardo, who was sitting behind Carlos, was found further away from the bicycle, consistent with trying to flee, and he had been shot once in the back. The witness at the scene described the gunman's truck as speeding away after the final shots were fired. Given the circumstances, Trejo's statements that he shot Carlos in the face or check, and he shot Eduardo twice in the back, were not lacking indicia of reliability even though Carlos was actually shot in the head and Eduardo was shot once in the back. Trejo was shooting and driving at a high rate of speed, which might explain his lack of precise accuracy, but he was correct about the general location of the fatal gunshots.

There was also no evidence that defendants had motives to exaggerate their descriptions of the murders to Garcia. Garcia never expressed doubts or rejected the veracity of their accounts. He even added misleading details, such as whether they used a .44-caliber gun or another car, just to get their reactions, and defendants clarified that they were in the white truck and used a .22-caliber revolver.

We thus conclude defendants' statements to Garcia were not testimonial within the meaning of *Bruton* and *Crawford*, the hearsay statements constituted admissions and

32.

declarations against interest, and the court properly denied defendants' Sixth Amendment objections.[8]

## II.     Admission of Villanueva's revolver

As set forth in the factual statement, Villanueva was found in possession of a .22-caliber revolver during a traffic stop that occurred over a year after the Reedley murders.

Villanueva, joined by Trejo, contends the court should have granted his motion to exclude evidence that he was found in possession of the revolver during the traffic stop. He argues the evidence was prejudicial and violated his due process rights because the revolver was never connected to the murders, and the jury could have relied on the weapon to conclude Villanueva had the propensity to carry guns while traveling in cars.

### A. Pretrial motions

Villanueva filed a pretrial motion to suppress the .22-caliber revolver which was found in his possession during the traffic stop. Villanueva argued the traffic stop was pretextual, and the patdown search was illegal and unconstitutional. The court conducted an evidentiary hearing, found the traffic stop and patdown search did not violate the Fourth Amendment, and denied Villanueva's suppression motion.

Villanueva separately argued that even if the revolver was legally seized, it should be excluded from evidence because his possession of the gun was unduly prejudicial pursuant to Evidence Code section 352, since the weapon was never linked to the murders. The prosecutor conceded the revolver could not be conclusively connected to the murders, but argued the impact of the evidence went to its weight and not admissibility.

The court denied Villanueva's motion to exclude the revolver as prejudicial:

---

[8] Villanueva has not renewed his argument that the trial court should have granted his motion for severance.

33.

"I find that the firearm does have probative value, although it may be limited, it is not minimal, and it appears to be. And I understand the offer of proof, it will be established that there was a .22 caliber pistol involved in the shooting, [Villanueva is] found in possession of a .22 caliber pistol, and there are certain rifling characteristics of the pistol that, while they do not conclusively establish it is the same firearm, they offer additional consistencies that make the probative value of the firearm appropriate. If the evidence changes, I'll consider further motions."

Trejo also moved to exclude the revolver as evidence against him. Trejo argued the revolver was highly prejudicial because it was only connected to Villanueva and his brother, and there was no evidence which linked Trejo to the gun. The court replied that Trejo did not have standing to challenge the constitutionality of the search, and its prejudice analysis was equally applicable to Trejo.

After further pretrial motions, Villanueva renewed his prejudice objection to the revolver:

"[T]he issue is and it's [Evidence Code section] 1101 evidence … and also under [section] 352 is how does this police officer get on the witness stand and details what happened [during the traffic stop]? And my concern is that … afterwards, so I have proposed a stipulation for [the prosecutor] to consider, but … I'm very concerned about having this officer get on the witness stand post-crime and start talking about the detention and so forth."

Villanueva argued that while his possession of the revolver may be relevant, the underlying facts about the traffic detention and patdown search were irrelevant and prejudicial. Villanueva also argued it would be prejudicial for the jury to learn that he possessed a revolver while he was in a car.

The court denied Villanueva's renewed motion:

"[T]here's no allegation there was any other illegal conduct involved, except for the nonregistration attributed to the driver. There's no allegation [Villanueva] in any way was engaged in criminal behavior of the stop except he was coincidentally the passenger in the car and had the firearm in his possession, so from that perspective, I'll deny the motion."

## B. **Trial objections**

During trial, Villanueva renewed his objections to the introduction of the revolver, and argued the evidence should be limited to show that he had the pistol in his pocket, and not that he possessed a firearm in a vehicle. The court replied:

> "… I don't see the prejudicial value at that point substantially outweighs the probative value? I think – I understand your concern, but I have made it clear that I will not allow either – other counsel to argue to this jury to ask them to infer that one who carries a gun in his pocket in a car must have been carrying a gun in his pocket in a truck 14 months earlier. That is an improper argument. I won't allow it."

The court further held the proposed evidence did not consistent of inadmissible prior acts evidence pursuant to Evidence Code section 1101, subdivision (b), because "riding in a car with a gun is – unfortunately, in today's society, I think most people don't view that as something unusual."

> "Many jurors admitted they have guns. None of them admitted they have them in cars, but I don't think it is prejudicial when a juror hears that he was – had a gun in a car. He wasn't using it illegally. There is not going to be allegation[s] that he was brandishing it or using it for any other purpose, except he was carrying it in the car.
>
> "I will further, unless I hear other arguments allowing it, I will not allow argument that that in and of itself is a violation of the la[w], unless you open the door. So I will not allow argument, 'Well, it is illegal to carry a gun in the car?' That borders on being prejudicial.
>
> "Now, if it is made relevant by a question, I will reconsider, but I will modify my ruling to say, as well, parties cannot argue that it is – he was committing the illegal act of a firearm in a car, so he – he is in the habit of illegally carrying firearms in cars."

Neither defendant asked for any limiting instructions to the jury.

## C. **Analysis**

Defendants argue there was no relevant or probative value to the revolver found in Villanueva's possession 15 months after the Reedley murders, given the criminalist's inability to conclusively link the weapon to the victims' fatal wounds, and the

35.

criminalist's concession that there could be millions of .22-caliber revolvers with similar firing characteristics. Defendants further argue the jury could have improperly relied on Villanueva's possession of the revolver while riding in a car as impermissible character evidence – that he had the propensity to carry a firearm to perform a drive-by shooting.

The trial court has the discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid.Code, § 352; *People v. Lee* (2011) 51 Cal.4th 620, 643; *People v. Jones* (2013) 57 Cal.4th 899, 948.) " 'Evidence is substantially more prejudicial than probative ... [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) The prejudice to which Evidence Code section 352 refers concerns evidence that tends to evoke an emotional bias against the defendant as an individual and which has little effect upon the issues. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059.)

We review the trial court's rulings pursuant to Evidence Code 352 for an abuse of discretion. (*People v. Lopez*, *supra*, 56 Cal.4th at p. 1059.) The court's evidentiary rulings will be reversed only if it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice pursuant to *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Rogers* (2013) 57 Cal.4th 296, 326; *People v. Von Villas* (1992) 10 Cal.App.4th 201, 269.)

In this case, however, defendants argue the court's purported evidentiary error violated their due process rights to a fair trial and is subject to harmless error review under *Chapman v. California* (1967) 386 U.S. 18. "The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights. [Citation.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 809.) The erroneous admission of evidence

violates a defendant's federal due process rights only if its admission rendered the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Defendants renew the arguments they raised before the trial court – that the revolver had no probative value and the evidence was unduly prejudicial because the gun was never connected to the murders; that it only shared some characteristics with the fatal bullets; that there were thousands and perhaps millions of similar models in circulation; that Villanueva's possession of the gun while traveling in a car showed his propensity to arm himself in preparation for a drive-by shooting; and that the prosecution's own evidence refuted any claim the revolver was the murder weapon since Villanueva told Garcia that Trejo gave the murder weapon to "Baby Ene."

The evidence regarding the revolver was potentially relevant because the criminalist could not eliminate it as the murder weapon. There were no bullet or cartridge casings found at the scene of the murders, which would have been consistent with the fatal shots being fired from a revolver. The criminalist testified the victims were killed with .22-caliber, copper-washed, lead bullets, with poor measurable details. The intact projective recovered from Eduardo's body had been fired from a gun with a right twist, but the bullet found in Carlos's body had less detail. The criminalist explained the condition of the bullets meant they were fired from a gun which was either worn and/or dirty.

In light of this evidence, the weapon found in Villanueva's possession was a .22-caliber revolver which did not automatically expel bullet or cartridge casings. It was not clean, there was gun powder in the chamber, and there was heavy lead fouling in the barrel. The criminalist determined the revolver was operable and fired with a right twist. The test-fired bullets were of poor measurable detail because the gun was dirty.

Defendants' argument that the admission of the revolver constituted reversible error is meritless. We have already concluded the court properly admitted Garcia's testimony and the recordings of defendants' inculpatory statements against each other.

37.

The jury heard limited evidence about the traffic stop, the officer's observations of the license plate issue, and his determination that the vehicle was not stolen. There was no evidence that the officer was concerned the occupants of the car were about to commit a violent crime. The jury also heard that the revolver could not be conclusively linked to the murders; that there were hundreds of different models of .22-caliber revolvers; that a right twist was more common than a left twist; and that there were thousands and possibly millions of these firearms in circulation.

Defendants speculate the jury may have been troubled by Villanueva's possession of the revolver while traveling in a car; that the jury may have relied on the revolver as propensity evidence that Villanueva regularly traveled with a firearm to commit drive-by shootings; and that the jury's improper conclusions similarly prejudiced Trejo. Even if the court abused its discretion when it admitted this evidence, however, the jury would have been equally troubled after hearing the admissible evidence of defendants' detailed statements to Garcia, in which they admitted that they randomly selected and murdered two teenagers on a bicycle to avenge the unrelated murder of one of their fellow gang members, and they were pleased and satisfied after performing the murders.

Thus, in the context of the facts of this case, the potentially prejudicial evidence of Villanueva's revolver was not particularly inflammatory. (See, e.g., *People v. Kipp* (1998) 18 Cal.4th 349, 372 [risk of prejudice "was not unusually grave" where the disputed evidence was not "significantly more inflammatory than the [charged] crimes"].) Moreover, there was overwhelming evidence of defendants' guilt, and any error in admitting this evidence was harmless under either *Watson* or *Chapman*.

In the alternative, defendants argued their defense attorneys were prejudicially ineffective for failing to ask the court to give a limiting instruction to the jury, that it could not consider the revolver as evidence of Villanueva's alleged propensity to possess weapons in a vehicle and commit drive-by shootings.

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.) For the same reasons, we find that the failure of the defense attorneys to ask for any limiting instructions was similarly harmless given the nature of the crimes, the admissibility of Garcia's testimony, and the overwhelming evidence of defendants' guilt.

## III. The prosecutor did not commit misconduct during closing argument

Trejo, joined by Villanueva, contends the prosecutor committed prejudicial misconduct during several portions of his closing rebuttal argument. They assert the prosecutor misstated the burden of proof, personally vouched for the strength of the prosecution's case, and improperly evoked sympathy for the victims. Defendants concede their defense attorneys did not object to the prosecutor's argument, and assert ineffective assistance as an alternative argument.

### A. Prosecutorial misconduct

We begin with the well-settled law on prosecutorial misconduct. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

39.

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.)

Defendants concede their attorneys did not make prosecutorial misconduct objections or request admonitions to the instances which they now raise on appeal. Their failures to object preclude their appellate claims of misconduct. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000; *People v. Cain* (1995) 10 Cal.4th 1, 48.)

In the alternative, however, defendants argue their attorneys were prejudicially ineffective for failing to preserve the objections. We will thus examine the merits of defendants' claim to determine whether the defense attorneys' failures to object were prejudicial, i.e., if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams, supra,* 16 Cal.4th at pp. 214–215.)

## B. <u>Reasonable doubt</u>

Defendants' first claim of prosecutorial misconduct is based on the claim that the prosecutor misstated his burden to prove the charged offenses beyond a reasonable doubt. As we will explain, however, defendants rely on an isolated portion of the prosecutor's lengthy rebuttal argument. The entire context of the argument refutes the defendants' claims of misconduct.

The prosecutor began this portion of his rebuttal argument as follows:

> "There was this talk [in the defense summations] about reasonable doubt versus utmost certainty. I reiterate once again the People accept our obligation under the law to prove this case beyond a reasonable doubt. We're not shirking that duty. That's our responsibility and it is our job to

40.

prove to you, the jury, the truth of these charges beyond a reasonable doubt.
[¶] … [¶]

"You'll see in the jury instructions the court gives you on reasonable doubt, the term utmost [certainty] isn't mentioned in there. Again, a lot of – there was a lot of discussion about reasonable doubt.

"Some of the stuff I actually agree with. Mr. Cherny [Villanueva's attorney] said – not too long ago he mentioned the term possibilities. Possibilities versus reasonable doubt.… That's a good analogy. Just coming in with a theory – coming up with some theory that goes to possible doubt. If a witness comes in and says yeah, this is possible, it's possible that a gang member lies about his murder they didn't commit, that's a theory. *If it is not backed up by evidence, that's all it is. It's just a theory. That's a possible doubt.*

"That's not reasonable doubt. Reasonable doubts are doubts that are based on evidence that have been introduced in the case." (Italics added.)

The prosecutor reviewed the trial evidence and then returned to reasonable doubt:

"Finally, there is zero evidence that the defendants lied about committing the murders, zero evidence to support that. That's a theory, and I asked [the defense expert] and he admitted it is just a theory. He doesn't have any evidence showing that the defendant lied about committing these murders and you don't either. That's simply a theory. *That's why that is a possible doubt. It is why it is not a reasonable doubt, because there is no evidence to back up and support that theory.*" (Italics added.)

*Analysis*

Defendants contend the italicized statements demonstrate the prosecutor's misstatement of the reasonable doubt standard. Defendants assert the prosecutor's argument improperly conveyed to the jury that reasonable doubt must be based on affirmative evidence presented by the defense, instead of being able to find reasonable doubt based on the prosecution's failure to present sufficiently persuasive evidence presented by the prosecution.

It is well-settled that while a prosecutor has broad discretion to discuss the legal and factual merits of the case, it is improper to misstate the law, and "it is misconduct for counsel to attempt to absolve the prosecution from its prima facie obligation to overcome

reasonable doubt on all elements.  [Citation.]"  (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.)  That did not happen in this case.  The prosecutor never misstated the reasonable doubt standard.  His comments, taken in context of this section of his rebuttal argument, addressed the defense attorneys' discussion of theories, and urged the jury to review the evidence to determine whether the prosecution met its burden of proving defendants' guilt beyond a reasonable doubt.

## C. **The prosecutor's personal opinion/vouching**

Defendants next contend the prosecutor improperly vouched for the strength of his case against the defendants.  Their argument is based on the italicized phrase in the course of the prosecutor's lengthy rebuttal argument below.

> "If you believe that the defendant lied about seeing Penguin out there, that doesn't mean he lied about committing the murders.  What's the key difference?  How do we know – how can you, as a jury, have confidence that the evidence proves that the defendant's statements prove about the murders that he's the actual killer, that's the one that committed the crimes?  Because those statement[s], the statements of the defendants about the murders are corroborated.  That is something as a jury you can have confidence in.  That's, *as a prosecutor, when I'm looking at the case, I can have confidence in knowing* that you're taking a statement like both of the defendants gave about the murders that include details about the murders and that those statements about the murders are corroborated by other evidence in the case.

> "In this case, there's a lot of corroboration.  There is corroboration about the details that the defendants gave.  They gave a lot of details in their statements.  They said where it took place, when it took place, how it took place, which victim was shot first, where those victims were shot, who the other person was, who shot them [*sic*], who was with them, the other gang member, which side of the vehicle the shooting took place, what kind of weapon they used.  And guess what?  All of those details that they say corroborate with the physical evidence that we have in this case, that we know from the crime scene."  (Italics added.)

42.

*Analysis*

Defendants cited the italicized phrase and assert the prosecutor improperly vouched for the case and declared the evidence against them was "especially strong when [he] compared it to the evidence in other cases.…" Again, it is well-settled that "[i]t is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citation.] The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

However, a prosecutor's comments cannot be characterized as improper vouching if the prosecutor's assurances regarding the honesty or reliability of a prosecution witness, or the strength of the case, are based on the facts of the record and inferences reasonably drawn there from, rather than from any purported personal knowledge or belief. (*People v. Bonilla, supra,* 41 Cal.4th at pp. 336–337.) Again, that is exactly what the prosecutor argued in rebuttal – that defendants did not lie when they told Garcia about the murders because their statements were independently corroborated by the witness who saw the drive-by shootings and the physical evidence. The prosecutor did not commit misconduct.

## D. Sympathy for the victims

Defendants' final claim of misconduct is that the prosecutor improperly called upon the jury's sympathies for the victims at the end of his rebuttal argument, which likely prejudiced the jury against them.

This issue is based on the court's earlier evidentiary ruling that photographs of the victims were admissible. These were photographs which showed the victims in life, and not murder or autopsy photographs. The court described these photographs as "very

43.

neutral .… They're not depicted at any location. For all we know it could be anything from high school yearbook to booking, to a party. It is just that case. There is not context to the photographs at all, absent the faces."

At the conclusion of his rebuttal argument, the prosecutor displayed these photographs to the jury for a few seconds and argued:

"Now, folks, these are our victims, [Carlos and Eduardo]. The evidence in this case shows, without contradiction, that they were murdered in cold blood. There was no justification why they were murdered. They didn't deserve for this to happen. [The defense] tried to make this about getting a conviction. This case is about – this isn't me as a prosecutor. It is not about the defense attorneys. This case is about two victims that were murdered in cold-blooded murder who didn't deserve for that to happen to them.

"As a jury, your decisions reflect what we, as a community, value and care about. In this case, based on the evidence that proves these defendants are the ones who committed these two murders, we're asking that you find them guilty. Don't let sympathy, don't let thoughts of punishment guide your decision. Base it on the evidence, the defendants' own statements giving details about the murders and the evidence that corroborates their statements. Thank you."

After the completion of argument, the jury left the courtroom and the court clarified the defense attorneys had lodged continuing objections to the prosecutor's brief display of the victims' photographs. The court further noted: "By my calculation, they were displayed between four and five seconds. I want the record to be clear they were displayed and the amount of time they were displayed."

*Analysis*

Defendants contend the prosecutor had no legitimate reason to display the victims' photographs at the conclusion of his rebuttal argument, since there was no real dispute about the victims' identities, and the only reason was to improperly evoke sympathy for the victims and obtain guilty verdicts.

44.

"Courts should be cautious ... about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. [Citation.] But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. [Citation.] The decision to admit victim photographs falls within the trial court's discretion, and an appellate court will not disturb its ruling unless the prejudicial effect of the photographs clearly outweighs their probative value. [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 331–332; *People v. Smithey* (1999) 20 Cal.4th 936, 974–975.)

In this case, however, any error in admitting the photographs, and then having the prosecutor display them to the jury at the close of his rebuttal argument, was harmless under any standard. The evidence against both defendants was very strong, and it is highly unlikely the jury was swayed by sympathy rather than the admissible evidence in this case. (See, e.g., *People v. DeSantis* (1992) 2 Cal.4th 1198, 1231; *People v. Osband* (1996) 13 Cal.4th 622, 677–678.)

## IV.     Cumulative error

Both defendants argue their convictions must be reversed for the purported cumulative errors of the *Aranda/Bruton* violation, admission of the revolver, and the purported prosecutorial misconduct. Having rejected these contentions, we similarly reject their due process arguments.

## V.     The LWOP Sentences

Villanueva and Trejo argue their LWOP sentences which they received for the multiple murders with special circumstances must be reversed based on *Miller*, *supra*, 132 S.Ct. 2455, which held that life sentences for juveniles who are under the age of 18 years when they commit the offenses violate the Eighth Amendment. Defendants assert they are within the classification of juveniles contemplated by *Miller* because Trejo was 19 years old, and Villanueva was 18 years and two days old, when the murders were committed.

In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court held: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide [the defendant] with some realistic opportunity to obtain release before the end of that term…." (*Id.* at p. 82)

In *Miller, supra,* 132 S.Ct. 2455, the court subsequently added that the reasoning in *Graham* "implicates any life without parole sentence imposed on a juvenile," including a sentence imposed upon a juvenile convicted of murder. (*Miller*, *supra*, at p. 2465.) A state is not required to guarantee eventual freedom, but must provide meaningful opportunity to obtain release based upon the defendant's demonstrated maturity and rehabilitation. (*Id.* at pp. 2469–2470.)

As applied to this case, defendants concede they were over the age of 18 years when they committed the murders in this case, and they were tried as adults. Defendants argue they are close enough to being under the age of 18 years old that the concerns about LWOP sentences for juvenile offenders should also apply to their situations. The United States Supreme Court has anticipated such an argument. In *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), the defendant committed a murder when he was 17 years old, and was convicted and sentenced to death when he was 18 years old. *Roper* held the execution of individuals who were older than 15 years but under the age of 18 years when the capital crime was committed is prohibited by the Eighth and Fourteenth Amendments. (*Id.* at pp. 555, 568.) In reaching this holding, *Roper* further noted:

> "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* [*v. Oklahoma* (1988) 487 U.S. 815] drew the line at 16. In the intervening

years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." (*Id.* at p. 574; quoted with approval in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380; see also *People v. Argenta* (2012) 210 Cal.App.4th 1478, 1482.)

We are bound by the line drawn by *Roper* between juvenile status and adulthood for purposes of criminal sentences, and decline to reverse defendants' LWOP sentences as violating the Eighth and Fourteenth Amendments.

## **DISPOSITION**

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Gomes, J.

47.